FITZSIMMONS & Others v. OGDEN & Others.

[Present....Judges Washington, Livingston, Todd, Duvall & Story.]

He who has equal equity, may acquire the legal estate, if he can, so as to protect his equity.

THIS was an appeal from the decree of the Circuit Court for the district of New York, sitting in chancery, entered by consent *pro forma* to bring the case before this court.

The material facts as stated by *Washington, justice,* in delivering the opinion of the Court were as follows:

For the purpose of securing certain of his creditors, Robert Morris, on the 14th of February, 1798, conveyed to the appellants, as trustees for those creditors, a certain tract of land lying in Ontario county, in the state of New York, containing 500,000 acres, described by certain bounds. Previous to this, he had made conveyances to sundry persons of considerable portions of this tract, and amongst others to the defendants, S. Ogden, J. B. Church and to G. Cottringer under whom the heirs of sir William Pulteney claims, of which the appellants had full notice. He had also, by different conveyances, granted to the Holland company more than three millions of acres of land, purchased (as this tract of 500,000 acres had been,) from the state of Massachusetts, all in the same county and adjoining the land in question.

On the 8th of June, 1797, a judgment, at the suit of Talbot and Allum against Robert Morris, was docketted in the Supreme Court of the state of New York: which, being prior in date to the conveyance made to the appellants, bound all the land which passed by it to the appellants. The bill states that Robert Morris, being confined in the jail at Philadelphia, in order to prevent any im-

proper use from being made of the above judgment, and on condition that the title to the land conveyed to the trustees should in no wise be impaired by it, procured Gouverneur Morris to advance the money for such judgment, from motives of friendship....that the said judgment was assigned to Adam Hoops the mutual friend and agent of the parties, which was done to prevent it from being used injuriously against the trustees and the creditors for whom they acted, and also to preserve to Robert Morris the right of redemption in 1,500,000 acres which he had conveyed to the Holland company, in nature of a mortgage as he supposed. That A. Hoops afterwards assigned the said judgment to gouverneur Morris, and on the 16th of September, 1799, Robert Morris confirmed the said trust deed (of which it is worthy of remark, no mention had been made in the previous parts of the bill,) and further agreed that any other land he might have in that county, which had not been previously conveyed, should be applied to pay that judgment in the first place, and the said last mentioned lands were to be sold upon an execution and to be purchased by A. Hoops under Talbot and Allum's judgment for the trustees, to which G. Morris assented, the trustees agreeing to mortgage the land to be purchased, to repay G. Morris the sum advanced for the purchase of the judgment.

It appears by the evidence, that, previous to the promise thus charged in the bill to have been made by G. Morris, to R. Morris the judgment of Talbot and Allum had been conditionally purchased by R. Morris, jun. one of the appellants, avowedly for his individual use, from Cotes, Titford and Brooks who then held it by assignment. That when this purpose was effected, it was agreed that the assignment should be made to A. Hoops, though in reality for the use of R. Morris, jun. and should remain in the hands of a third person as an escrow to take effect on the payment of the note given by the said R. Morris, jun. for the purchase of the judgment, and that the same should belong to Thomas Cooper, who endorsed the said note, in case he should be compelled to discharge the same.

R. Morris, about the time when this note would become due, found himself unable to take it up, and, on

FITZSIM-
MONS &
OTHERS
*v.*
OGDEN &
OTHERS.

this account, G. Morris had been solicited by R. Morris, and consented to pay the money and to retain the judgment to secure the advance. G. Morris in his answer, expressly denies that any communication was made to him by R. Morris of his motives for asking his assistance in procuring an assignment of the judgment....or that he had ever heard or knew of the claim of the trustees to any part of this 500,000 acre tract, or that the same would, in any manner, be affected by the judgment of Talbot and Allum, until some time after he had paid for the judgment, when it was accidentally communicated to him by A. Hoops, who held the assignment of the same for A. Morris, jun. as before mentioned. Upon receiving this information, G. Morris, with the assistance of his counsel, Thomas Cooper, projected a plan for protecting the interests of the trustees from being sacrificed by a sale under the execution which might issue on that judgment. Articles of agreement were accordingly drawn and executed by G. Morris and A. Hoops on the 29th of August, 1799, by which it was stipulated that the whole of the lands in the county of Ontario, purchased by R. Morris from the state of Massachusetts amounting to upwards of four millions of acres should be sold under the judgment, and should be purchased by A. Hoops who should convey a certain part thereof to G. Morris, and should also mortgage that part of the said land which then belonged to the trustees, to the said G. Morris, for securing the advance made by him on the purchase of the said judgment. Although this large tract of country was, by this arrangement, to be sold under the above judgment, yet that judgment being posterior to the conveyances made to the Holland company, as well as to the other defendants below, they were consequently not bound by the judgment, nor could the title of the grantees have been affected by a sale under it. The object of this agreement, however, in relation to those lands, was to secure to G. Morris a supposed, but totally unfounded claim which R. Morris had asserted to an equity of redemption in one of the large tracts sold by him to the Holland Company, and also an imaginary quantity of surplus land presumed by R. Morris to be somewhere within the bounds of this great tract of country which was to be sold, which surplus, as it afterwards turned out, had no

real existence.　As to the land belonging to the trustees, which it is admitted was bound by this judgment, G. Morris was contented to receive a mortgage of that to secure his advance for the judgment.

A draft of an agreement was also made by Thomas Cooper, by the directions of G. Morris and delivered to A. Hoops to be carried to Philadelphia, and to be proposed to R. Morris and the trustees;....but the terms of that agreement do not appear in any part of this record, although it is fairly to be presumed that it did not vary materially from the above agreement between G. Morris and A. Hoops.　This draft was not altogether approved by the parties in Philadelphia, and another agreement was accordingly drawn and executed by R. Morris, the trustees and A. Hoops, bearing date the 16th of September, 1799, which did not materially differ from the agreement of the 29th of August preceding, except, that, by the latter, the surplus land, if there should be any, was to be mortgaged to the trustees as a security for reimbursing the whole or such part of the aforesaid judgment as the trustees might be obliged to pay for the discharge of the mortgage to be given by A. Hoops for securing the advance made by G. Morris for the purchase of the judgment.

This agreement was afterwards shown to G. Morris who expressed some displeasure at its departure from the plan which he had himself arranged; but he admits in his answer that he never communicated his disapprobation either to R. Morris or to the trustees.

It appears in evidence that there was a stay of execution on the judgment of Talbot and Allum for three years from the time it was entered, which of course would not have expired before the 8th of June, 1800. This stay was released by R. Morris at some period subsequent to the interview which took place at the jail between R. Morris and G. Morris; but the particular time when it was executed does not appear from the record.　It is not, however, improbable that it was not long subsequent to the second of May, 1799, since it appears that, on that day, R. Morris, jun. in a letter addressed to T. Cooper, directing him to assign the said

FITZSIMMONS & OTHERS
v.
OGDEN & OTHERS.

FITZSIM-
MONS &
OTHERS
v.
OGDEN &
OTHERS.
judgment to G. Morris, requested him also to forward to him the form of a release to be executed by his father.

In pursuance of the arrangement which had been agreed upon, between these parties as above mentioned, all the lands which R. Morris had purchased from the state of Massachusetts in the county of Ontario were advertised to be sold under the said judgment, on the 6th of February, 1800. Hoops, as it had been agreed, attended on the day of sale and bid for the land; but being overbid and not having the means to pay for the same in case it should be struck off to him, he prevailed upon the sheriff to adjourn the sale to the 13th of May following, upon his engaging to pay the sheriff his poundage, which undertaking G. Morris, soon afterwards, on application, furnished him with the means of discharging.

On the 22d of April, 1800, G. Morris, without having communicated to R. Morris or to the trustees the slightest intimation that he had come to such a determination, assigned over the said judgment to the Holland company for a full consideration paid therefor, and without notice, as they, the Holland company, expressly allege in their answer, of the claim of the trustees or of the equity stated in their bill.

The same day, articles of agreement were entered into between Thomas L. Ogden....the Holland company.... and G. Morris; by which it was stipulated that the sale of all the lands by the execution on the aforesaid judgment, should take place, and should be purchased by the said Ogden in trust to convey to the Holland company. the several tracts of land which had been granted to them by R. Morris and to the several persons to whom conveyances had been made within the limits of the 500,000 acre tract prior to the deed to the trustees, the tracts to which they were respectively entitled, or such parts thereof as three persons, Hamilton, Cooper and Ogden should direct; and as to the residue of the said 500,000, in trust to convey the same to such persons, in such parcels and upon such terms as the said Hamilton and others should direct. In execution of this agreement, Ogden attended the sale on the 13th of May,

and purchased the whole of the lands taken in execution under the said judgment for the sum of $ 5,200 and received a sheriff's deed for the same.   Hamilton, Cooper and Ogden, in virtue of the powers vested in them, directed conveyances to be made by Ogden to the Holland company according to the bounds expressed in the several conveyances to them by R. Morris, except so far as such bounds would interfere with Watson, Cragie and Greenleaf.  In order to compensate the defendants, Samuel Ogden, sir William Pulteney and John B. Church, for the land taken on the westward of their tracts, by fixing the true meridian line of the Holland company to the east, the eastern line of those persons is made to run in upon the lands claimed by the trustees, so far as to give the former the full quantity of land mentioned in their respective conveyances.   The direction, or award as it is called, then proceeds to allot to the trustees 58,570 acres (not half the quantity they claimed) upon certain conditions, one of which is to pay to the said trustee, for the use of the Holland company, $ 5,623 with interest from the 22d of January, 1800.   This sum together with others charged upon such of the grantees as were benefited by this arrangement, were intended to reimburse the Holland company, the sums they had advanced, not only for the purchase of Talbot and Allum's judgment, but of another, which, being posterior to the conveyance to the trustees, created, of course, no lien upon any part of the 500,000 acre tract.

FITZSIM-<br>MONS &<br>OTHERS<br>v:<br>OGDEN &<br>OTHERS.

The prayer of the bill is for a conveyance by Thomas L. Ogden, of all the land to which the trustees are entitled according to its real boundaries, upon the trustees paying such proportion of the money due by Talbot and Allum's judgment as is fairly chargeable on their land, and for general relief.

This cause was argued at great length in February, 1810, by *Pendleton* and *Lewis* for the Complainants, and by *Edwards* and                   for the Defendants; and again at this term by *Joseph R. Ingersoll, E. Tilghman, P. B. Key* and *Lewis* for the Complainants, and by *D. B. Ogden* and *Stockton* for the Defendants.

For the Complainants, it was contended

FITZSIM-
MONS &
OTHERS
v.
OGDEN &
OTHERS.

That *Thomas L. Ogden,* who purchased the land at the sheriff's sale under *Talbot and Allum's* judgment, was, under all the circumstances of the case, to be considered in equity, as a *trustee* for the Complainants, to the extent of their legal title before that sale....or in other words, that the sale was void as to the Complainants, and ought to be set aside upon the complainants, paying their proportion of the amount due upon the judgment, which was a *lien* upon two smaller tracts, as well as upon that which was claimed by the Complainants.

Thomas L. Ogden was the agent of the Holland company to whom Gouverneur Morris had assigned the judgment. This assignment having passed, not a *legal,* but an *equitable* right to a *chose in action,* was subject to the same equity in the hands of the Holland company, as it was in the hands of Gouverneur Morris, whether the Holland company had actual notice of that equity or not; because nothing but the *equitable* right of Gouverneur Morris passed by the assignment. The Holland company had no right to use it in any other way than *he* could have used it. *They* could make no use of it, which *he* could not have made *with a good conscience.* They were bound by the same conscientious principles towards Robert Morris the elder and the Complainants, which ought to have guided Gouverneur Morris. Their agent, T. L. Ogden, could not give a better estate under the sale than G. Morris himself could, if he had continued to hold the judgment and had become the purchaser. The only equity which he had was to the extent of the security necessary to reimburse the money which he had *advanced,* at the request and for the use and benefit of Robert Morris. He merely became a creditor of Robert Morris with a lien upon the lands to the extent of the debt; which lien he held under a trust, a confidence, a plighted faith, that it should not be enforced to the injury of Robert Morris, or his assignees; and even that it should be used for the benefit of R. Morris or his assignees, as far as it could be used consistent with G. Morris's security as to the mount paid for the judgment. Indeed, as the only interest or equity which G. Morris had in the judgment was merely as a security *sub modo* for the amount due upon the judgment, the judgment as to every other use which could be made of it, consistent with the security of G. Morris, belonged,

to R. Morris; and G. Morris was bound in conscience and good faith to use it in such manner as R. Morris should direct. If therefore Gouverneur Morris, instead of T. L. Ogden, had purchased the land under the judgment, he would have holden it merely as an indemnity, and as to every other purpose would have been a trustee for R. Morris or his assigns.

The facts, so far as the conscience of G. Morris was concerned in the case, are simply these. Robert Morris, the elder, knowing that the judgment threatened the validity of the deed of trust which he had made to the Complainants, who represented a class of creditors to whom he felt himself under peculiar obligations, entered into an engagement, through the agency of his son R. Morris, jun. to purchase the judgment for the purpose of holding it as a shield for the protection of the conveyance to the Complainants. Being unable to comply with the terms of the purchase, he requested Gouverneur Morris to *advance the money* due on the judgment, saying that he would thereby render him an essential service, and would be safe as 'the judgment was a lien upon a very large tract of land. To this, G. Morris assented, *from motives of friendship*, and to render his friend *an essential service*. How it was to have that effect, was not perhaps, *at that time explained;* but the natural inference was that the judgment was to be subject to the control of R. Morris, as to every disposition of it consistant with the security and indemnity of G. Morris; who was bound in conscience, in honor, and in friendship, to have submitted it to his control. The disposition which he did make of it, was in violation of all these obligations, and therefore ought in equity to be set aside.

The Complainants had a right to tender the amount due, upon the judgment to G. Morris at any time. They knew that the judgment was a lien upon their lands, but they knew that there was a *stay of execution until the 8th of June*, 1800. Until that period they were safe....and Mr. R. Morris himself could not in equity release that stay so as to affect those lands without giving notice to the Complainants. It would have been a fraud if he had. They knew that the judgment had been assigned to G. Morris. They knew the circumstances under which that assignment was made. They knew the understand-

ing, the friendship, the confidence which subsisted be-
tween Gouverneur Morris and Robert Morris, the elder.
They had a right to rely upon it and to consider them-
selves as safe. They had a right to believe that no use
would be made of the judgment without their knowledge.
They knew of the release of the stay of execution, and
that the release was made for their benefit. They were
parties to the agreement under which it was made, they
knew that this agreement had been made known to G.
Morris and that he had *acquiesced*, if not assented. But
neither his acquiesence nor assent was necessary, ex-
cept as to the provision made for his indemnity :....for so
far only was he interested. They knew that a sale for
their benefit had been attempted under the judgment,
but was postponed to a future day. They knew that
the failure of this attempt and the postponement of the
sale, were known to G. Morris, and that he had even
paid the poundage demanded by the sheriff upon the
postponement. He knew that all these things were so
understood by the Complainants, and that they had this
confidence in him, and were lulled into security. At this
moment, without any notice, or intimation to the Com-
plainants, he assigned over the judgment to the Holland
company, for purposes which he knew to be repugnant
to the interests of the Complainants. It is this of which
the Plaintiffs complain as unconcientious and injurious;
and the consequences of which they seek to avoid.

It is true that G. Morris himself cannot properly be
charged as a *trustee*, because an *equity* cannot, with
propriety, be said to be the subject of a trust, or to be
holden in trust; for the equity will always be in the
*cestue que trust*, and not in the *trustee*. But if G. Mor-
ris, under all these circumstances, had himself acquired
the legal estate to the lands conveyed to the Complain-
ants, he would have been a trustee for them, upon their
paying or tendering him the money due by the judgment.
He had no other equity to protect, and could not have
protected his legal title under the equity of others. Nor
had the Holland company any equity to protect. There
were no interfering lines, nor any other cause of dispute
between them and the Complainants. Their agent,
Thomas L. Ogden, even after the sheriffs sale, was in no
better situation than G. Morris would have been in, if
he had been the purchaser. He had no right to claim

protection under the equity of any third person. He had full notice from the Complainants before he made any conveyance under what is called the *award* of Hamilton, Ogden and Cooper. He therefore is to be considered merely as the agent of the Holland company, who took only the equity of G. Morris; and having acquired the legal estate with full knowledge that the Complainants were entitled to every possible benefit under that judgment beyond the interest of Gouverneur Morris, whose right extended only to indemnity for the advance he had made, he is to be considered as a trustee for the Complainants for all beyond that indemnity; and upon receiving the amount due upon the judgment, ought to be decreed to convey to the Complainants all the lands which he purchased at the sheriffs sale which lie within the tract conveyed to them by R. Morris, by the deed of the 14th of February, 1798.

It was also contended by the Counsel for the Complainants, that in as much as Mr. R. Morris, had agreed to release the stay of execution for one purpose only, the execution could not legally be issued for another purpose, and therefore the sale was void *at law*. But whatever intrinsic force this argument might have had, it could not be considered by the Court, because it was expressly admitted upon the record that the execution was *regularly issued.*

It was further said in behalf of the Complainants, that although, at the time when G. Morris agreed to purchase the judgment, it was not stated in what manner the judgment should be used so as to be of service to his friend R. Morris, yet as G. Morris varied the conversation, he must be considered as having agreed that R. Morris should direct in what manner it should be used....and, that as R. Morris by his agreement of the 16th of September, 1799, did direct how it should be used, (to which agreement G. Morris did not object,) he was in equity bound to suffer that agreement to be carried into effect; and therefore his assignment of the judgment to the Holland company with a view to defeat the purpose of that agreement was against conscience, and affected all the subsequent proceedings under that assignment.

The conveyances made by T. L. Ogden to Church and others, being made after notice given to him by the Com-

plainants cannot injure their rights. He is liable to them at all events, and must look to those to whom he has conveyed the lands for his indemnity....an indemnity which he has taken care to sect

The counsel for the Complaina  ., a  ow that by the assignment of the judgment nothing but an *equitable* interest passed, and that the assignee held it liable to the same equity to which it had been liable in the hands of the assignor, cited; 1. *Vez.* 123, *Hill v. Caillovel.* 2. *Vern,* 765, *Turton v. Benson. Prec. in Chancery* 524, *S. C.*

To show that a purchaser without notice is not protected, if he has notice before he pays the purchase money and gets a deed, they cited, 1. *Atkins* 384, *Wigg v. Wigg.* 2. *Atk.* 630, 631, *Story v. Lord Windsor.* 2. *Eq. ca. ab.* 685, *pl. 9. Jones v. Stanly.* 3. *P. Wms.* 307, *Tourville v. Naish.*

To support the position that where the assignment passes only an equity, notice is not necessary....and that if no legal estate passes, *qui prior est in tempore, potior est in jure,* they cited, 3. *P. Wms.* 308. *Tourville v. Naish.* 3. *Brown C. C.* 264. *Williams v. Lambe.*

To show that a trustee is liable for a breach of trust, they cited 1. *P. Wms.* 128. *Pye v. George.* 2. *P. Wms.* 610. *Mansell v. Mansell.* 2. *Salk,* 680, *Pye v. George.* And *Gilbert's Forum Romanum.*

To show that where a recital in a deed leads to notice, there notice shall be presumed; they cited 1. *ca. in ch.* 291. *Bisco v. Earl of Banbury.* 2. *ca. in ch.* 246, *Moore v. Bennett & Ambler,* 311, 312. 1. *Atkins,* 490, *Smith v. Law. Vernon,* 585, *Ferrars v. Cherry.*

And to show what will raise an implied trust, they cited, 1. *Vezey* 289, *Barnesly v. Powell.* 1. *Vernon,* 276, *Palmer v. Young.* 1. *P. Wms. Brown v. Litton,* 1. *Atk.* 383, 384, *Wigg v. Wigg.* 1. *Br. C. C.* 81, *Sonley v. Clockmakers company*....and the case of *Slocum and wife v. Marshal and others,* in the Circuit Court of the United States, for the district of Pennsylvania.

*On behalf of the appellees,* it was said,

1st. That there was no trust for the benefit of the Complainants; and consequently they have no equity.

2d. That if there was originally a trust for their benefit, yet as the Defendants have acquired the legal title, (without notice of the equity of the Complainants,) they, the Defendants, have equity enough to support the legal estate they have thus acquired, to the extent of the number of acres intended originally to have been conveyed to them by R. Morris, the elder.

1st. There was no trust for the benefit of the Complainants.

The Complainants set forth the trust in Gouverneur Morris to be *to prevent the judgment from being used injuriously to them, and to preserve to Robert Morris, his right of redemption in that part of the lands which was supposed to be mortgaged to the Holland company.* No consideration flowed from the Complainants, whereby to raise an implied trust in their favor. The consideration was merely personal between Gouverneur Morris an Robert Morris; it was a matter of confidence; and the former violated that trust or confidence, he was lia ble only to Robert Morris.

*At law,* no man can support an action upon an agreement unless he is a *party*; or some consideration flowed from him. *Cro. El.* 369, *Jordan v. Jordan.* 1. *Str.* 592, *Crow v. Rogers.* 1. *Vent.* 6, *Bourne v. Mason.* It is true there are some modern cases in which it has been holden that the person to *whose use* the promise was made may maintain an action in his own name, but it must be in a case where the *whole use and benefit* are to accrue to the Plaintiff. But here, even as stated in the bill, the trust was in part for the benefit of *Robert Morris.*

If the Complainants would not have a right to enforce the agreement at law, neither can they compel its execution in equity.

This bill is in the nature of a bill for the specific performance of the agreement between Robert Morris and Gouverneur Morris, charging the Holland company with notice.

FITZSIM-      A Court of Chancery decrees a specific execution of
MONS &    a contract because a suit at law would not give a com-
OTHERS    plete remedy; but a Court of Chancery will not decree a
*v.*        specific performance unless the party would have a right
OGDEN &   to recover damages in a Court of law.  Here was no
OTHERS.   right at law, and therefore this court cannot decree a
————      specific performance of the agreement.  1. *Vez.* 444,
*Penn v. Lord Baltimore.  Scholles and Lefroy* 552, *Harvey v. Yielding.*

It is an universal principle in Chancery, that the complainant must show himself entitled by his bill.  *Mitford* 43 *(15) Bartons suit in equity,* 36, 37.  He must recover according to his *allegations* and his *proofs.*  Proofs without allegations are not sufficient, even if his proofs should show a good title to relief.  The only allegation like an averment of a trust is that G. Morris agreed that he would not use the judgment to the injury of the Complainants, nor to bar R. Morris's right of redemption.  As to the latter part of the supposed trust the Complainants cannot recover, and R. Morris is no party to the suit.  On this account the bill is defective....2. *Atk.* 510, *Darwent v. Walton.*  But even the allegation in the bill, imperfect as it is, is not supported by the evidence.  G. Morris, in his answer, denies that R. Morris communicated to him his motives for wishing him to purchase the judgment, and most expressly denies any agreement on his part not to use it to the prejudice of the Complainants.  This answer, being directly responsive to the allegation of the bill is conclusive evidence, unless contradicted by more than one witness.  But it is confirmed by the deposition of R. Morris, as far as it relates to that interview.  G. Morris states that he was induced to become the purchaser by motives of personal friendship towards R. Morris.  It was the duty, therefore, of R. Morris to have explained to his friend in what manner the purchase was to be made serviceable to him, and who were the parties really to be benefited thereby.  If he did not do it, and intended that others should derive the benefit, it was a fraud upon the feelings of friendship.  But it is clear that R. Morris did not request it with a view principally to the security of the Complainants.  He states in his deposition that his objects were, 1. The equity of redemption, 2. The surplus tract which it was supposed remained unconveyed,

and 3d. To prevent injury to the Complainants. The visit of R. Morris, jun. to New York, was to prevent the effect of certain attachments, and to secure the surplus lands so as to make a provision for his mother. Hoops, in his deposition, says that the security of the Complainants *was not an object* in the first purchase of the judgment.

There was neither equity of redemption nor surplus land. How then was G. Morris to be secured for the amount of the judgment, unless by the lands of the Complainants? And yet they say that the judgment was not to affect those lands. It would be absurd to suppose such a trust. The agreement of 16th of September, 1799, shows that there was no such trust. And the answer of G. Morris, not being contradicted, is conclusive evidence that the trust did not exist. *Pre. ch.* 19, *Kingdome v. Boakes.* 2. *Atk.* 140, *Janson v. Rany.* 3. *Atk.* 407, *Only v. Walker.* 1. *Br. C. C.* 52, *Pember v. Mathers.*

No equity arose from the release of the stay of execution. If there did, it was an equity in *R. Morris,* and not in the Complainants.

The time and place of sale were fixed by the agent *of the Complainants,* and therefore they cannot complain, nor allege the want of notice.

The inadequacy of price is by no means so great as the Complainants pretend; but if it was it cannot affect the equity of the Defendants case. If they obtained the legal title they have equity enough to support it, even if it cost them much less than 5,000 dollars. *But a sheriff's sale fairly and publicly made has never been set aside for inadequacy of price.* If there be no trust, the inadequacy of the price is immaterial.

There must be in every trust, a *subject* of the trust, a *trustee,* and a *cestue que trust.* But here is no subject.... the proceeds of the judgment were not for the Complainants. They were the absolute property of G. Morris. He never held the land. But what sort of a trust was it? Not a *resulting* trust, for that can only be raised in favor of the person from whom the consideration moved.

FITZSIM-<br>MONS &<br>OTHERS<br>*v.*<br>OGDEN &<br>OTHERS.

And that it was not an *express* trust is admitted. If it was neither an implied nor an express trust, G. Morris was the absolute owner of the judgment.

A man can not be made a trustee unless the extent of his trust be fully explained to him. 10, *Vez. jun.* 511, ————— *Lench v. Lench.*

The *fact* of the trust is to be found by the Court from the evidence as a jury would find it:

Secret trusts are dangerous. Since the statute of frauds nothing is left of the whole fabric of parol trusts but a *resulting* trust....which is a trust arising by implication, from the fact that the purchase money was paid by, or the consideration moved from, the party who claims the benefit of the trust. 2. *Atk.* 384, *Parteriche v. Powlet.* 3. *Br. C. C.* 577, *Fordyce v. Willis.* And it is only lately parol evidence has been admitted to prove the facts from which a trust, as to lands, would result. *Cruise's digest,* 472. 1. *Vern,* 366, *Gascoigne v. Thewing.* 10. *Vez. jun.* 366, *Rider v. Kidder.*

In the case of *Lloyd and Jobson v. Spillet and others,* in 2, *Atk,* 150, *Lord Hardwicke* said,...."I am now bound "down by the statute of frauds and perjuries, to construe "nothing a *resulting trust,* but what are there called trusts "by operation of law; and what are those? Why, *first,* "when an estate is purchased in the name of *one* person; "but the money or consideration is given by *another;* "or *secondly,* where a trust is declared only as to part, "and nothing said as to the rest, what remains, undis- "posed of, results to the heir at law, and they cannot "be said to be trustees for the residue. I do not know "any other instance where this Court have declared "resulting trusts by operation of law, unless in cases of "fraud and where transactions have been carried on "*mala fide.*"

Lord Harkwicke was not perfectly correct as to the extent of the doctrine. Later cases have added the cases of a failure of the consideration....and where the consideration is merely nominal. 1. *Cruise dig.* 471, § 29, &c. A purchaser for full value has never been adjudged to be a trustee for another, 7. *Br. Parl. ca.*

526, *Pilkinton v. Bailey.* 1 *Cruize* 485, § 60.   *S. C.* <span style="float:right">FITZSIM-</span>
*abridged,* 4 *Bur,* 2255. <span style="float:right">MONS &<br>OTHERS</span>

<span style="float:right">*v.*</span>
  2d. But if there had been a trust, and although the <span style="float:right">OGDEN &</span>
assignment by G. Morris to the Holland company, was <span style="float:right">OTHERS.</span>
an assignment of an equitable right only, and therefore
not protected by want of notice, yet the agent of the
Holland company having obtained the *legal* title without
notice of the trust either by himself or the Holland com-
pany, he has a right to hold against a mere *legal* claim
on the part of the Complainants. For the mistake as to
the boundary, being a mistake to the prejudice of th
Defendants, can create no *equity* in favor of the Com-
plainants. It was a mistake by which the Complainants
would have *gained,* and the Defendants would have *lost,*
more than one thousand acres of land. If Gouverneur
Morris had purchased the judgment with a full know-
ledge of this mistake of the boundaries, and with a view
to secure the benefit thereof for the Complainants, and
to do this injustice to the Defendants, no Court of equity
would have aided him in accomplishing the purpose; and
even if he had acquired the legal title to the land under
such circumstances, it is more than probable that a
Court of equity would have granted relief to the De-
fendants.

A Court of equity will never interfere against a *bona
fide* purchaser, for a valuable consideration, without no-
tice, but will permit him to save himself by any *legal*
plank which he can lay hold on. 1. *Eq. ca. ab.* 353,
322. *And in the case of Jerrard v. Sanders,* 2. *Vez. jun.*
457, Lord Loughborough said that in such a case a Court
of equity *has no jurisdiction.*

In as much therefore as the Complainants who seek to
*gain* by the *loss* of the Defendants. have no equity arising
from the mistake of the boundaries; and as the Defendants
have the *legal title* supported by *a strong case in equity,*
the Complainants are not entitled to the aid of a Court of
equity.

*Feb.* 20.* WASHINGTON, J. after stating the facts of
the case, delivered the opinion of the Court as follows:

---

* Absent MARSHAL Ch. J. and Livingston, J. the other five present.
VOL. VII.

FITZSIM-
MONS &
OTHERS
*v.*
OGDEN &
OTHERS.

The first point made by the counsel for the appellants is, that G. Morris ought to be considered as a trustee of Talbot and Allum's judgment for the trustees. On this point it is contended that, although in the first instance, G. Morris might have had no other inducement in purchasing that judgment than to perform a friendly service to R. Morris, yet he afterwards charged himself with the interests of the trustees by an express declaration contained in the agreement of the 29th of August, 1799, connected with the subsequent agreement of the 16th of September, 1799, which, notwithstanding his disapprobation of some parts of it, he adopted by his silence and subsequent conduct. The trust being thus established, it is then contended that the Holland company, the purchasers of this judgment from G. Morris, took the same clothed with all the equitable rights of the trustees, which were attached to it in the hands of G. Morris upon the ground that a judgment is a chose in action, and the assignment passes no more than an equitable interest to the debt of which it is the evidence. Having arrived at this point, the title of the trustees is placed upon the well known principle which governs a Court of Chancery, that between merely equitable claimants, each having equal equity with the other, he who hath the precedency in time, has the advantage in right.

If the cause rested upon this state of the case, it would be incumbent on the Court to examine these principles and their application to the respective pretensions of the trustees and of the Holland company. Whether an equity arising to a third person who claims the chose in action, and whose title depends upon a secret trust and confidence between him and the ostensible assignee, has equal equity with the person who afterwards purchases the judgment bona fide and without notice of a fact not disclosed by the previous assignments, is a question which the Court deems it unnecessary to decide, because, tho' the equity of the trustees and the Holland company should be admitted to be equal, yet the latter have acquired another title to the subject in controversy which a Court of equity will never disturb. They, or rather their trustee, have got the fruits of their execution, and have obtained the *legal estate* in the land on which the judgment gave them only a lien. Having at least equal equity with the trustees, it was perfectly justifiable in them to obtain a superiority by buying in the legal estate.

Aware of this difficulty, one of the counsel for the apel-lants found it necessary to contend that the sale on the 13th of May was absolutely void, the execution having been taken out before it could lawfully issue in consequence of the stay on record which prevented its emanation prior to the 8th of June following. This, however is arguing against the fact; because we find that long prior to the sale and assignment of the judgment to the Holland company, the *testatum fi: fa:* had issued by the consent of R. Morris as well as of the trustees, who, on the 6th of Feb. 1800, had endeavored to render it effectual by a sale attempted on that day. The release of the stay is not spread on the record so that the terms of it, or its date might be examined. But since the execution could not legally issue without a regular release filed in the Court where the judgment was of record, and since the form of such a release was applied for, by one of the trustees so early as the 2d of May, 1799, it must be presumed, against the trustees and in favor of the regularity of the proceedings, that the release was in due form, and bore date prior at least to the emanation of the execution.

But it is contended that the consideration for this release was the trust declared by G. Morris in August, 1799, or acquiesced in by him under the agreement of the 16th Sep. and that his breach of trust in selling the judgment to the Holland company with a view to the intended purchase of the lands in dispute by them, did away the effect of the release previously executed by R. Morris. That this was a legal consequence of the alleged breach of trust can scarcely be maintained. The release being once regularly executed and delivered could never afterwards be avoided at law by a failure of one of the parties to perform an act in consideration of which the release was given. It could extend no further than to charge G. Morris with a breach of contract for which he might be personally liable to the party aggrieved. But as to third persons claiming fairly under him, without notice of the alleged breach of trust, the legal effect of the release would remain unimpaired.

It is very obvious, however, that the whole of this argument is founded on an assumption of facts which are not proved, and which cannot and ought not to be presumed. It does not appear from the evidence in the

FITZSIM-MONS & OTHERS
v.
OGDEN & OTHERS.

FITZSIM-
MONS &
OTHERS
v.
OGDEN &
OTHERS.

cause that the trust assumed by G. Morris was the con-
sideration of that release, and yet if the trustees would
avail themselves of that circumstance to invalidate the
sale, and to deprive the Holland company of the shield
by which they have protected their equitable interest,
such proof should be clearly made out.   On the contra-
ry, the Court must consider the fact as established (since
it is asserted on oath by G. Morris in answer to a charge
in the bill, that the object of G. Morris in purchasing
the judgment, was to confer a personal benefit on R.
Morris only,) that, in consequence of this undertaking,
made with the knowledge of one of the trustees, and for
the purpose of giving effect to this intention, the release
was made, and it is fairly to be presumed that it was
executed long prior to the arrangement made by G.
Morris and the trustees in August and September, 1799,
because, as has been before observed, the form of a
release was applied for as early as the 2d of May pre-
ceding.   If the date of the release was contemporaneous
with, or subsequent to the agreements of August and
September, it was in the power of the trustees fully to
have established the fact.   Being essential to their ar-
gument, their having omitted to furnish the proof affords
a strong presumption against them.

It is contended that the Holland company ought to be
considered in the light of purchasers of the judgment
with notice of the trust, because, knowing, as they were
bound to do, that the execution could not issue before
the 8th of June, 1800, they were necessarily led to in-
quire into the right which they assumed of taking out
execution at a prior day, and in making this inquiry
they must have come to a knowledge of the trust.   But
the previous issue of the execution, fortified by the cir-
cumstance of the sale under it, attempted in February
and continued by adjournment to the 18th of May, ren-
dered all inquiries into the cause of the release unneces-
sary.   It was enough for them that the impediment to
the issuing of the execution was removed at the time
they purchased the judgment.

The cause appears to the Court to be so clearly in
favor of the Holland company and those claiming un-
der them, upon the point which has been examined, that
it seems almost unnecessary to notice those circumstan-
ces which detract from the equitable title of the trustees.

But it is obvious that the injury of which they complain FITZSIM-
has arisen in a great measure from the want of energy MONS &
in themselves, and a kind of helpless dependence upon OTHERS
others, even after they were fully apprized of the steps      v.
which were taking and which finally led to the loss from OGDEN &
which they now seek to extricate themselves.   Mr. OTHERS.
Fitzsimmons was informed by A. Hoops, prior to the ——————
22d of April, 1800, that the agent of the Holland com-
pany had gone on to New York, and the intention of
this visit was most probably communicated to him, as
Mr. Hoops, at the same time, advised him to have an
understanding with G. Morris. If he received from
this advice nothing further than a hint of possible mis-
chief, it was sufficient to put them upon inquiry and ex-
ertion.

An attempt was made, though not much pressed, to
charge G. Morris with a breach of trust, and with the le-
gal consequences thereof. That his declining to com-
municate to the trustees his intended sale of Talbot and
Allum's judgment to the Holland company upon terms
which might seriously affect the interest of the former,
was unkind, and a departure from the friendly conduct
he had manifested towards them, may be admitted. But
since it must be taken as a fact in the cause that no pro-
mise of any kind had been made by G. Morris in favor
of the trustees, or to his knowledge, in reference to their
interests, prior to the agreement of the 29th of August,
1799....(and even this agreement, or the draught made by
Cooper and forwarded by Hoops to R. Morris and the
trustees for their signature, is not alleged in the bill
with any degree of certainty as a ground on which the
trust is founded—) and since the arrangement proposed
by G. Morris in that agreement and draught was reject-
ed by those parties and another substitued in their stead
to which G. Morris was no party, it would be going too
far for a Court of equity, in such a case, and in favor of
persons who would do nothing for themselves, to make
G. Morris a trustee by implication for the purpose of
charging him with a breach of trust. It is true that G.
Morris might have communicated to the trustees his
disapprobation of the change they had made in his ar-
rangement, and his refusal to abide by that which they
had proposed as a substitute, so as to have afforded them
an opportunity to retrace their steps. But surely he
was not, in point of law, as much bound to make such a

FITZSIM-
MONS &
OTHERS
v.
OGDEN &
OTHERS.

communication as the trustees were to obtain a certain knowledge of his assent to the agreement of the 16th September. He had gratuitously offered to do a favor to the trustees upon certain conditions. They reject the offer as mad and propose other conditions. It was incumbent on them to obtain his assent to the new proposal if they meant to consider him in the light of a trustee.

The opinion given upon these points renders it unnecessary to consider the question of boundaries.

*Decree affirmed, without prejudice.*