UNITED STATES of America

v.

Herman E. WALKER, Jr.

Crim. A. No. 80–486.

United States District Court, E. D. Louisiana.

May 7, 1981.

John P. Volz, U. S. Atty., Michael Schatzow, Asst. U. S. Atty., New Orleans, La., for United States of America.

Michael S. Fawer, E. Sue Bernie, Fawer & Greenbaum, New Orleans, La., for Herman E. Walker, Jr.

HEEBE, Chief Judge:

This cause came on for hearing on the defendant's motion to dismiss the bill of information filed against him by the United States Attorney for the Eastern District of Louisiana. The defendant urges two grounds in support of his motion: (1) the government's evidence at trial will necessarily vary from the allegations set out in the information and this variance requires dismissal of the information; and (2) the government's filing of this bill of information, which followed its refusal to permit the federal grand jury for this district to vote whether to return an indictment on the same evidence that the government will introduce at trial under this information, constitutes prosecutorial vindictiveness or misconduct in violation of the Due Process Clause. Because this Court finds no merit to either of the defendant's arguments, his motion to dismiss is denied.

## I

The parties vigorously dispute the factual basis surrounding this controversy as well as what facts, their relevance and weight, are before this Court or that this Court can recognize for the purposes of this motion. Therefore, in order fully to understand the dispute involved in this motion, it is necessary to set out the factual dispute between the parties.

The defendant avers that this entire controversy grew out of an Internal Revenue Service investigation conducted by IRS Special Agent William Kostrzewski, Jr., into the conduct of one of the defendant's patients. Kostrzewski visited the defendant's office in order to enlist the defendant's cooperation in the investigation by permitting Kostrzewski to examine one of the defendant's patient's files. During the conversation between Kostrzewski and the defendant, Kostrzewski placed some of his own papers on the defendant's desk, which also contained the patient files on the person under investigation by Kostrzewski. After the defendant refused Kostrzewski's request for assistance, Kostrzewski gathered his own papers from the defendant's desk along with the patient files and began to exit the defendant's office. Fearful that his patient's files were in jeopardy of being taken, the defendant then forcibly retook the patient files from Kostrzewski. Shortly thereafter, Kostrzewski left without the patient's files.

Kostrzewski later filed a complaint against the defendant, accusing him of committing a forcible assault upon a federal employee engaged in the performance of his duties in violation of 18 U.S.C. § 111 (1976). The defense counsel then informally discussed the possibility of disposing of this matter without a trial on the merits with an Assistant United States Attorney who stated he would agree to a deferred prosecution plan. The defendant rejected this

proposal because he believed he had not violated any law. Consequently, the Assistant United States Attorney submitted the matter to the federal grand jury for this district for its consideration.

During the course of the grand jury's investigation, the defendant voluntarily testified before the grand jury. According to the defendant, after he offered his testimony, a "clamor" arose within the grand jury room from which "[b]ecause of the volume of the voices [within], it was evident that the grand jurors were putting [the Assistant United States Attorney] to task for accusing Dr. Walker of some wrongdoing." The Assistant United States Attorney then later informed the defense counsel that he was not going to ask the grand jury to vote on an indictment notwithstanding the fact that the grand jury had before it all of the relevant evidence concerning the matter in controversy. Instead, the government filed a bill of information against the defendant, charging him with the use of a threat of force to impede an agent of the Internal Revenue Service in the performance of his duties, a misdemeanor violation of 26 U.S.C. § 7212(a) (1976). After the government filed its bill of information, the defendant filed suit in federal court to require the government to submit the evidence before the grand jury to a vote. The defendant's motion was denied, and he has filed an appeal of that decision, rendered by a different court of this district, to the Fifth Circuit Court of Appeals.

The government contends most of the facts set out by the defendant are wholly irrelevant to the issues presented by this motion and responds to the factual contentions made by the defendant only for the purpose of setting the record straight.

According to the government, agent Kostrzewski went to the defendant's office already possessing certain documents previously furnished to Kostrzewski by one of the defendant's employees. These documents pertained to the bills that had been paid to the defendant by one of his patients who was then under investigation by the IRS, and the documents did not contain any medical information relating to that, or any other, patient of the defendant's. The defendant's employee had provided Kostrzewski with the documents but declined to sign an affidavit concerning these bills prepared by Kostrzewski without the defendant's permission. The employee orally informed Kostrzewski, however, that the information found in the affidavit was accurate.

Kostrzewski met with the defendant at the request of the defendant's employee who had previously provided Kostrzewski with the material he already possessed. Kostrzewski did not request any additional documentation from the defendant during this meeting and, particularly, did not request to obtain or see any of the defendant's patient's medical files. When he was preparing to leave the defendant's office, Kostrzewski gathered only his own papers that he had brought with him to the defendant's office and took none of the medical files or records of any of the defendant's patients. The defendant then took from Kostrzewski the documents that had been provided to Kostrzewski by the defendant's employee as well as the affidavit Kostrzewski had prepared in his own handwriting.

The government also disputes several of the defendant's contentions regarding the events that occurred after Kostrzewski left the defendant's office. The government denies that Kostrzewski himself filed the complaint against the defendant. Moreover, the government states that the grand jury began its investigation into this matter, and the first witness testified before that grand jury, before the Assistant United States Attorney and defense counsel began any negotiations or discussions as to whether this matter could or should be resolved informally, and prior to the entry into this case of the present defense counsel. The government also disputes the defendant's contention that there is no additional evidence to support the charge set out in the bill of information and also states that while the government did at one time represent to the defendant that the grand jury had all the relevant evidence before it, the government no longer holds that posi-

tion. Finally, the government argues that the defendant's conclusions regarding the subject matter and substance of the "clamor" that arose within the grand jury's chambers are sheer speculation, as is the defendant's opinion that the failure of the grand jury to return a true bill after voting on the question would have disposed of this case.

## II

■ The defendant's first argument proceeds in four basic steps. First, the use of force to impede the efforts of an Internal Revenue Service officer in the discharge of his duties constitutes a felony violation of 26 U.S.C. § 7212(a) but the obstruction of an IRS agent by only the threat of force constitutes only a misdemeanor violation. Second, proof that the defendant used force to impede Kostrzewski, irrespective of whether the defendant also employed the threat of force to impede Kostrzewski, by itself prevents the government from obtaining a conviction under the misdemeanor provisions of § 7212(a) because, as a matter of statutory interpretation, the phrase in § 7212(a) "only by threats of force" automatically elevates a defendant's crime from a misdemeanor to a felony whenever any proof of the use of force is established and thereby erases any misdemeanor conviction otherwise obtainable through proof of the threat of force alone. Third, the evidence is indisputable that the defendant actually used force against Kostrzewski. Therefore, this difference between what the government can and must demonstrate at trial to obtain a misdemeanor conviction and what the evidence at trial will invariably establish constitutes a "variance" requiring dismissal of the outstanding bill of information. This argument is flawed in several respects.

## A

■ The defendant argues that the outstanding bill of information must be dismissed because "the *probata* cannot possibly support the *allegata* if this case is brought to trial." Defendant's Motion to Dismiss Information at 6. This variance requires dismissal because the proof at trial will necessarily establish that the defendant committed a felony which cannot be charged by bill of information.[1] This Court must deny the defendant's motion on this ground because it is not ripe for consideration at this time.

■ Rule 12(b) of the Federal Rules of Criminal Procedure permits a defendant to raise by a pretrial motion "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue." Under Rule 12(b), "[a] defense is thus 'capable of determination' if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington*, 395 U.S. 57, 60, 89 S.Ct. 1559, 1560, 23 L.Ed.2d 94 (1969) (footnote omitted); 8 J. Moore, Moore's Federal Practice ¶ 12.04, at 12–25 (2d ed. 1980 & Cum.Supp.1980). *See also United States v. Sisson*, 399 U.S. 267, 301 & n.55, 90 S.Ct. 2117, 2135 n.55, 26 L.Ed.2d 608 (1970).

---

1. The government has responded to the defendant's variance argument by arguing, in part, that the variance doctrine is inapposite to the issue here because an information may be amended after it is filed unlike an indictment. *Compare* F.R.Crim.P. 7(e) (permitting amendment of an information) *with Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887) (indictment may not be amended without resubmission to the grand jury). The government's argument is correct as a general principle of criminal procedure but is not responsive to the defendant's argument in this case. The defendant has argued that the evidence at trial will demonstrate that the defendant committed a felony, if anything, and that a felony cannot be prosecuted by a bill of information. Thus, any defect in this bill of information cannot be cured by an amendment at trial. In addition, the amendment contemplated by the government's argument would be to charge the defendant with a violation of 18 U.S.C. § 111 or a felony violation of 26 U.S.C. § 7212(a). These offenses are clearly "different" from a misdemeanor violation of § 7212(a), *see* notes 4, 10, & 33 and accompanying text, *infra*, and would not be permitted by Rule 7(e) notwithstanding any constitutional bar. Therefore, the defendant's argument here cannot be dismissed on the ground that the variance doctrine is inapplicable to a bill of information.

Using this test, this Court cannot consider the merits of the defendant's variance argument at this time because, by definition, a variance cannot arise prior to the close of proof in a criminal trial. "A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." *Dunn v. United States*, 442 U.S. 100, 105, 99 S.Ct. 2190, 2193, 60 L.Ed.2d 743 (1979). *See Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960) (a variance is "a variation between pleading and proof"). Because there has been no evidence introduced at any trial in this matter, it is impossible for the upcoming trial to be of no assistance in determining the validity of this defense.[2] This Court also cannot credit the defense counsel's representations as to what the evidence at trial will demonstrate because this Court is neither endowed with the psychic powers to predict what the evidence at trial will establish nor empowered with the authority to make any determination along these lines, *see Serfass v. United States*, 420 U.S. 377, 389, 95 S.Ct. 1055, 1063, 43 L.Ed.2d 265 (1975); *United States v. Knox*, 396 U.S. 77, 83 & n.7, 90 S.Ct. 363, 367 & n.7, 24 L.Ed.2d 275 (1969); *United States v. King*, 581 F.2d 800, 802 (10th Cir. 1978), but must accept as true the allegations in the pleadings without considering any evidence outside the pleadings proffered by any party. *United States v. King, supra*, 581 F.2d at 802; 1 C. Wright, Federal Practice and Procedure § 194, at 412–13 (1969 & Supp. 1980). *Cf. United States v. Mann*, 517 F.2d 259, 266–67 (5th Cir. 1975), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976) (no evidence outside the indictment can be considered on a Rule 12(b) challenge to the sufficiency of the indictment).[3] Therefore, the defendant's variance argument must be rejected because it is not ripe for decision at this time.

### B

■ The defendant's argument is even more deeply flawed, however, because his interpretation of § 7212(a) is erroneous. At the heart of his argument is his proposition that the phrase in § 7212(a) "only by threats of force" not only establishes a necessary condition for proving a misdemeanor violation but also establishes a limiting condition, *i. e.*, where either party demonstrates the use of force in addition to the threat of force, the defendant's conduct is automatically elevated from a misdemeanor to a felony, eliminating any possible misdemeanor conviction despite the existence of only a misdemeanor charge against the accused. His argument, then, calls for an interpretation of § 7212(a), particularly the phrase "only by threats of force." The starting point for this analysis is, as always, the language of the statute itself, and "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumers Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Albernaz v. United States*, —— U.S. ——, ——, 101 S.Ct. 1137, 1141, 67 L.Ed.2d 275 (1981). Where the language of the statute is unclear, the legislative history and policies motivating the act should be consulted to

---

**2.** Even the cases cited by the defendant in support of his argument demonstrate that this Court cannot prospectively determine the existence of a variance. *See, e. g., United States v. Canales*, 596 F.2d 664, 670–71 (5th Cir. 1979) ("The evaluation of a claim of variance, therefore, involves application of a two-step analysis: first, to ascertain whether there *was* in fact a variance between indictment and proof, and second, to determine whether the variance *was* prejudicial." (emphasis added); *United States v. Lambert*, 501 F.2d 943, 947–48 (5th Cir. 1974) (en banc) ("Once the evidence is in it must appear, by *retrospective comparison* of *probata* with *allegata*, that the defendant *was*

deprived of fair notice sufficient to enable him to prepare his defense. (footnote omitted) (emphasis added); *id.* at 948 n.7 ("Another aspect of the traditional test for fatal variance involves the inquiry whether the indictment and proof correspond*ed* sufficiently to afford the defendant protection against reprosecution for the same offense.") (emphasis added).

**3.** Because this Court cannot look to any evidence outside of the bill of information itself, this Court declines the defendant's invitation to examine the testimony of the defendant and other witnesses before the grand jury.

discern the meaning of the act. *Bifulco v. United States*, 447 U.S. 381, 391–99, 100 S.Ct. 2247, 2254, 65 L.Ed.2d 205 (1980). In this case, all three factors lead to the conclusion that the interpretation of § 7212(a) offered by the defendant must be rejected.

1. *Language and structure of the act*

Section 7212(a) reads as follows:

Whoever corruptly or by force or threats of force (including any threatening letter or communication) endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this title, or in any other way corruptly or by force or threats of force (including any threatening letter or communication) obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title, shall, upon conviction thereof, be fined not more than $5,000, or imprisoned not more than 3 years, or both, except that if the offense is committed only by threats of force, the person convicted thereof shall be fined not more than $3,000, or imprisoned not more than 1 year, or both. The term "threats of force", as used in this subsection, means threats of bodily harm to the officer or employee of the United States or to a member of his family.

The language of this statute can be parsed in, at least, two different ways. This section can be interpreted to encompass two different types of impediments to the effective operation of the internal revenue laws, interference with officers or employees of the Internal Revenue Service who are acting in an official capacity and interference "in any other way" with "the due administration" of the internal revenue laws, a much broader range of prohibited behavior, with different penalties creating different classes of offenses depending on whether the defendant acted through corrupt solicitation or with force, on the one hand, or merely through the use of the threat of force, on the other hand. Alternatively, § 7212(a) can be parsed by focusing on the different classes of offenses created by the statute rather than the differ-

ent interests it protects. Viewed in this fashion, § 7212(a) creates two different classes of offenses, a felony and a misdemeanor, depending upon whether the defendant corruptly solicits or forcefully impedes a covered employee, either of which could establish a felony, or merely uses the threat of force to impede the effective operation of the internal revenue laws, which is a necessary condition for a misdemeanor violation. In either case, this section of the Internal Revenue Code is designed to protect the Internal Revenue Service, and its officers and employees, from three different types of harms: (1) corrupt solicitation; (2) forceful interference with the operation of the internal revenue laws: and (3) the threat of forceful interference with the operation of those laws. Each of these harms affects separate and distinct interests that the federal government would wish to protect, with the first two types of proscribed conduct receiving greater sanctions than the third by virtue of being treated as felonies rather than misdemeanors. Under this reading of § 7212(a), the felony and misdemeanor provisions are separable with neither provision cancelling out the other. In short, nothing in the language of the statute gives any indication that Congress sought to permit a defendant to escape liability for violating one provision of the statute, thereby violating one interest § 7212(a) seeks to protect, by additionally violating another provision of the statute, and so harming another interest.

The plain language of the entire statute does not support the argument advanced by the defendant. The phrase "only by threats of force" cannot be plucked from the language of the sentence in which it is found but must be read in light of the entire passage of which it is a part. Read in this fashion, this phrase does not refer solely to the misdemeanor provisions of the statute and create a redhibitory defect in the proof essential for a misdemeanor conviction but, instead, refers to the entire statute and serves as the dividing line between felony and misdemeanor violations. Proof that the defendant employed the threat of force is an essential element of the misdemeanor

provisions of this section. Coupling proof of the use of force to proof of the threat of force does not eliminate a valid conviction obtainable merely upon proof of the latter element alone but merely demonstrates that the defendant has also violated another part of the same act. Hence, the language of the act does not support the defendant's interpretation.

### 2. *Legislative history*

The legislative history of § 7212(a) also does not support the defendant's interpretation of the act. Section 7212(a) traces its lineage to § 38 of the Internal Revenue Service Act of 1864, ch. 173, 13 Stat. 238. As originally enacted, this section provided:

> That if any person shall forcibly obstruct or hinder any assessor or assistant assessor, or any collector or deputy collector, revenue agent or inspector, in the execution of this act, or of any power and authority hereby vested in him, or shall forcibly rescue, or cause to be rescued, any property, articles, or objects, after the same shall have been seized by him, or shall attempt or endeavor to do so, the person so offending shall, upon conviction thereof, for every such offence, forfeit and pay the sum of five hundred dollars, or double the value of the property so rescued or be imprisoned for a term not exceeding two years, at the discretion of the court: ....

In the 1939 Internal Revenue Code, the acts prohibited by this section were split into two separate subsections, Int.Rev. Code of 1939, ch. 34, §§ 3601(c)(1) and (2), 53 Stat. 436, with the penalty for both the forceful interference with an Internal Revenue Service employee and the forceful rescue of seized property set out in subsection (2). According to § 3601(c):

> If any person shall ... (1) ... [f]orcibly obstruct or hinder any collector, deputy collector, internal revenue agent, or inspector, in the execution of any power and authority vested in him by law, or ... (2) ... [f]orcibly rescue or cause to be rescued any property, articles, or objects after the same shall have been

seized by him, or shall attempt or endeavor to do so, the person so offending, excepting in cases otherwise provided for, shall, for every such offense, forfeit any pay the sum of $500, or double the value of the property so rescued, or be imprisoned for a term not exceeding two years, at the discretion of the court.

The current version of § 7212(a) was enacted as part of the Internal Revenue Code of 1954. As proposed by the House of Representatives, the new section would be "similar" to 18 U.S.C. § 111, which prohibited the forceful assault of a federal employee engaged in the performance of his duties, but "amplified" the protection afforded Internal Revenue Service employees by "cover[ing] all cases where the officer is intimidated or injured; that is, where corruptly, by force or threat of force, directly or by communication, an attempt is made to impede the administration of the internal-revenue laws." H.R.Rep.No.1337, 83d Cong.2d Sess., *reprinted in* [1954] U.S.Code Cong. & Ad.News 4017, 4136. The House version of the new section would have set the same penalty for all such attempts to interfere with the administration of the internal-revenue laws, a maximum of 5 years imprisonment or a $10,000 fine or both, which would have made the interference with the operation of the internal revenue laws by threat of force a felony. The Senate version of this section was also "broader" than 18 U.S.C. § 111 "in that it covered threats of force (including any threatening letter or communication) or corrupt solicitation," S.Rep. 83d Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Ad.News at 5254. The Senate version, however, classified this offense as only a misdemeanor, punishable only by a maximum term of imprisonment at 1 year and a maximum fine of $3,000. S.Rep. 83d Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Ad. News at 4782. After a conference on the differences between the House and Senate versions of the proposed Internal Revenue Code, the Conference Committee accepted the Senate version of this provision. H.R. Rep.No.2543, 83d Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Ad.News at

5344. The version adopted by the Conference Committee is the current version of § 7212(a).

The legislative history of § 7212(a), therefore, also does not support the construction of the statute that the defendant would force upon it. This statute began as a provision forbidding only the forceful interference with an employee of the Internal Revenue Service engaged in the performance of his duties. The prohibition of interference by the threat of force entered the statute in the House version of the 1954 Internal Revenue Code in an attempt to expand the protection of the criminal provisions of the Code. The House act adopted an expanded version of the already existing federal assault statute, prohibiting the forceful assault of a federal employee, by prohibiting both the forceful assault of Internal Revenue Service employees and the intimidation by threat of force of Internal Revenue Service employees. The Senate version included the provision regarding the forceful intimidation of such federal employees proposed by the House but classified this provision as a misdemeanor rather than a felony. The Conference Committee resolved this difference by adopting the Senate version of the act. Hence, the legislative history of the current version of the statute demonstrates quite clearly that the phrase "only by threats of force" was not inserted to defeat a misdemeanor conviction through proof that the defendant had also used force against an IRS employee but was inserted to classify such intimidation as a misdemeanor in accordance with the Senate version of the Code.

### 3. *Motivating policies behind the act*

The interpretation offered by the defendant also suffers from the fact that it is inconsistent with the purposes behind Congress' enactment of the current version of § 7212(a). According to the legislative history, prior to the adoption of the current version of § 7212(a), neither the criminal provisions of the Internal Revenue Code nor the provisions of the federal penal code, Title 18, protected IRS employees from intimidation by means of threats of force. Section 7212(a) rectified this omission by including such intimidation within the scope of conduct made criminal by the act even though such conduct was made only a misdemeanor offense. Hence, the purpose of the misdemeanor provisions of § 7212(a) was to add intimidation achieved through the threat of force to the list of criminal offenses which already included forcible assault upon an IRS employee in both the felony provisions of § 7212(a) and 18 U.S.C. § 111. The addition of the misdemeanor provisions of § 7212(a) indicates that Congress intended this part of the statute to protect interests not encompassed either by the other parts of this statute or by § 111 of Title 18.

The defendant's interpretation of § 7212(a) runs afoul of this Congressional purpose for two reasons. First, adopting the defendant's interpretation of § 7212(a) would condition the government's use of the misdemeanor provisions of the act to those cases in which a defendant acted by threat of force alone, eliminating use of the misdemeanor provisions whenever the defendant may also have violated the felony provisions. Even where the misdemeanor and felony violations arose out of the same incident, the defendant's theory would impose an all or nothing condition on the use of the misdemeanor sanction in the absence of any express or implied Congressional purpose to bind the government in this fashion and in the face of an express Congressional purpose to protect different interests through the different parts of § 7212(a). This Court cannot impose such a condition on the government's use of the misdemeanor sanction in this statute. " 'We are not at liberty to imply a condition which is opposed to the explicit terms of the statute .... To [so] hold ... is not to construe the Act but to amend it.' " *Fedorenko v. United States*, —— U.S. ——, ——, 101 S.Ct. 737, 751, 66 L.Ed.2d 737 (1981) (quoting *Detroit Trust Co. v. The Barlum*, 293 U.S. 21, 38, 55 S.Ct. 31, 35, 79 L.Ed. 176 (1934)). The felony and misdemeanor provisions of this statute protect separate and distinct interests and constitute separate

and distinct offenses with proof of either standing apart from proof of the other.[4] Congress was entitled to protect these different interests through different criminal sanctions. Where the defendant's conduct violates more than one criminal statute covering the same conduct, the government may elect to prosecute him under any of the applicable statutes, *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), and the combination of several offenses into one statute is entirely irrelevant to the question of what conduct violates any one provision of that compound statute. Therefore, there is certainly no justification for reading into a criminal statute concerned with the substantive definition of criminal conduct, and not with the regulation of a prosecutor's charging discretion, a negative covenant prohibiting the government from prosecuting a defendant under any applicable provision, particularly one carrying the lesser of two possible penalties, simply because the defendant has also violated another provision of the same statute, one which carries a greater penalty than he now faces under the present charge. There is no "double or nothing" principle lurking in the federal criminal law, and it is difficult to believe that Congress could have intended one for § 7212(a).

Second, if the misdemeanor provisions of § 7212(a) were eliminated whenever a defendant also violated the felony provisions of the act, even if in the same course of conduct, a defendant could effectively exculpate himself from liability under one penal statute by also violating another part of the penal code. To be sure, it is unlikely that a person would rationally decide to trade at most one year in prison and a $3,000 fine for three years in prison and a $5,000 fine. But the defendant's argument would also apply in cases in which the defendant has not engaged in such a cost-benefit analysis and would permit him to violate one interest with impunity merely because he has also violated another interest Congress sought to protect. Section 7212(a) does not permit two wrongs to make a right.

There is also no principle of statutory construction that will save the defendant's interpretation of the act. While "ambiguities in criminal statutes must be resolved in favor of lenity," *United States v. Batchelder, supra,* 442 U.S. at 121, 99 S.Ct. at 2202 "the 'touchstone' of the rule of lenity is 'statutory ambiguity.' " *Bifulco v. United States, supra,* 447 U.S. at 387, 100 S.Ct. at 2252 (quoting *Lewis v. United States,* 445 U.S. 55, 65, 100 S.Ct. 915, 921, 63 L.Ed.2d 198 (1980)). "The rule comes into operation 'at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.' " *Albernaz v. United States, supra,* —— U.S. at ——, 101 S.Ct. at 1144 (quoting *Callanan v. United States,* 364 U.S. 587, 596, 81 S.Ct. 321, 326, 5 L.Ed.2d 312 (1961)). Considered in light of the statutory language of § 7212(a), its legislative history, and the Congressional purpose behind the act, § 7212(a) is not ambiguous and "[w]here Congress has manifested its intention, we may not manufacture ambiguity in order to defeat that intent." *Bifulco v. United States, supra,* 447 U.S. at 387, 100 S.Ct. at 2252. The phrase "only by threats of force" cannot be interpreted implicitly to repeal or condition the misdemeanor provisions of the act, *see United States v. Batchelder, supra,* 442 U.S. at 122, 99 S.Ct. at 2203, without impermissibly amending the act, *see Fedorenko v. United States, supra,* —— U.S. at ——, 101 S.Ct. at 751. Nor can this Court rely on the "spirit" of the act even if it is contrary to the "letter of the statute," *United Steelworkers of America v. Weber,* 443 U.S. 193, 201, 99 S.Ct. 2721, 2727, 61 L.Ed.2d 480 (1979), when the "spirit" and "letter" of the statute are congruent and both contradict the defendant's argument. There is simply

---

4. A felony violation of § 7212(a) requires proof of corrupt solicitation or the use of force while a misdemeanor violation of this statute requires proof of the threat of force. *See also United States v. Sciolino,* 505 F.2d 586, 588 n.3 (2d Cir. 1974) (distinguishing between elements necessary for conviction under 18 U.S.C. § 111 and for misdemeanor conviction under 26 U.S.C. § 7212(a)).

no basis for interpreting the phrase "only by threats of force" in the fashion suggested by the defendant.

## C

The defendant has based his argument solely upon the language of the statute itself. But the thrust of his argument—that the felony provisions of § 7212(a) absorb the misdemeanor provisions whenever both are shown—essentially puts forward the common law merger doctrine as the proper interpretation of the statute. In light of the similarity between these arguments and the courts' "long tradition of reading criminal statutes enacted by Congress 'in the light of the common law,'" *Whalen v. United States*, 445 U.S. 684, 713, 100 S.Ct. 1432, 1442, 63 L.Ed.2d 715 (1980)

(Rehnquist, J., dissenting) (quoting *United States v. Carll*, 105 U.S. 611, 612, 26 L.Ed. 1135 (1882)), this Court will examine the question of whether Congress intended to adopt the common law merger rule despite the absence of any reflection of that rule in the language of the statute itself.

█ After a rather unusual historical development, the rule emerged at common law that if an act resulted in both a misdemeanor and a felony, the misdemeanor was said to merge into the felony, leaving the latter as the only chargeable offense. *See* W. La Fave & A. Scott, Handbook of Criminal Law § 60, at 452 (1972); 1 C. Torcia, Wharton's Criminal Law § 24, at 111 (1978 & Supp.1981).[5] Several justifications have been advanced in support of the rule.[6] Ac-

---

**5.** The history of the development of this rule demonstrates, quite ironically however, that this final statement of the rule was the mirror image of the initial formulation of the merger doctrine. *See* Glazerbrook, The Merging of Misdemeanors, 78 L.Q.Rev. 560 (1962).

The origins of this doctrine lie deep in the common law, prior to the development of the classification of offenses into misdemeanors and felonies that is common today. In its earliest stages, the common law left the decision whether to seek rectification of a harm to the aggrieved party who had both a choice of remedies and a choice of courts in which he could prosecute his claim. The aggrieved party could elect between prosecuting a writ of trespass or an appeal of felony which, with, perhaps, some minor differences, were essentially parallel means of seeking redress. The concept that a misdemeanor merged into a felony was unknown at this time because the common law had not yet developed these two categories of offenses. After the distinction between misdemeanors and felonies had arisen, the merger doctrine, under that name, was created by, at least, the late Fifteenth Century in order to permit the prosecutor to elect to charge the accused with a misdemeanor rather than a felony on the ground that a misdemeanor was contained within a felony. The legitimacy of this practice was widely recognized by both the common law courts and the common law commentators. It was not until several hundred years later, during the early Eighteenth Century, that the merger rule changed its form in the common law courts and became a bar to the prosecutor's bringing a misdemeanor prosecution when a defendant could be charged with a felony for the same conduct. The new formulation of the rule became popular for a while but was severely criticized in the early Nine-

teenth Century by Lord Chief Justice Denman, among others, because of its potentially illogical consequence of freeing a defendant on both charges because he was guilty of both offenses and could establish his guilt of either while on trial for the other. Finally, after suffering "a fitful and at times precarious life," 1962 Cambridge, L.J. 8, 8, which was perhaps well deserved for a rule that "can find favour only with those who believe that litigation should resemble as closely as possible a game of snakes and ladders," Glazerbrook, *supra*, 78 L.Q.Rev. at 562, the later, illegitimate form of the common law merger rule was interred in 1851 by Parliament. The Criminal Procedure Act, 1851, 14 & 15 Vict., c. 100, § 12. The comments of the draftsman of that act were quite explicit on this point: "This section was introduced to put an end to all questions as to whether on an indictment for a misdemeanor in case upon the evidence it appeared that a felony had been committed, the defendant was entitled to be acquitted, on the ground that the misdemeanour merged in the felony." C. Greaves, Lord Campbell's Acts for the Further Improving the Administration of Criminal Justice 16 (London 1851). *See* Glazerbrook, *supra*, 78 L.Q.Rev. at 571–72.

**6.** The justifications offered in support of this rule are artificial, at best. "Most is heard of this unmeritorious defence after trials for felony had been assimilated in all material respects to trials for misdemeanor; at a time, too, when juries were markedly reluctant to convict of felony if it was to be punished by death or transportation, and when developing rules on the burden of proof could be exploited by skilful advocates. The reason is not far to seek. Few persons accused of misdemeanor were likely to plead that they had committed a felo-

cording to one theory, the rule developed because of and reflected the procedural differences between misdemeanor and felony trials at common law. In a misdemeanor trial, the accused was entitled to a copy of the charges against him, to be granted bail, to compulsory process to obtain witnesses in his favor, to examine his witnesses under oath, to a special jury, and to be assisted by counsel, none of which were available to him in a felony prosecution. 1 C. Torcia, *supra*, § 24, at 111; Glazerbrook, The Merging of Misdemeanors, 78 L.Q.Rev. 560, 572–73 (1962). *See also Powell v. Alabama*, 287 U.S. 45, 60–61, 53 S.Ct. 55, 60–61, 77 L.Ed. 158 (1932) (discussing common law right to counsel). Another theory argued that the rule was intended to prevent harassment of a defendant by reprosecution for the same conduct. Glazerbrook, *supra*, 78 L.Q.Rev. at 567, 570; 1962 Cambridge L.J. 8, 8. Finally, the merger rule has also been defended on the ground that the division of the defendant's conduct is irrational because his *mens rea* and the social harm occasioned by his conduct are the same regardless of how his conduct is divided. 1962 Cambridge L.J., *supra*, at 9–10. None of these arguments are persuasive, however.

■■■■■ The question of whether Congress intended to adopt this doctrine is entirely a question of legislative intent, *see Standefer v. United States*, 447 U.S. 10, 15–18, 100 S.Ct. 1999, 2003–2005, 64 L.Ed.2d 689 (1980); *Perrin v. United States*, 444 U.S. 37, 42–45, 100 S.Ct. 311, 314–315, 62 L.Ed.2d 199 (1979), and there is no reason to believe that Congress intended to incorporate the merger doctrine into § 7212(a). None of the Congressional reports indicate any intention to limit the availability of the misdemeanor provisions of this statute to

those cases where the threat of force alone was an issue. Rather, the legislative history of the statute demonstrates that Congress intended to create a separate statutory provision for dealing with the use of threats of force against IRS agents. Because the Congressional intent to separate the misdemeanor and felony provisions of § 7212(a) is incompatible with a corresponding intent to merge the two provisions, Congress could not have intended to adopt the merger doctrine. In addition, the English common law abandoned the merger rule in 1851, *see* note 5, *supra*, and American courts have generally repudiated the doctrine as well. W. La Fave & A. Scott, *supra*, § 60, at 452 & n.144; 1 C. Torcia, *supra*, § 24, at 112 & n.47. Therefore, it is unlikely that Congress intended to adopt a moribund doctrine. *Cf. Standefer v. United States, supra*, 447 U.S. at 19, 100 S.Ct. 2006. Felony defendants now enjoy the same, if not greater, rights as do misdemeanor defendants, 1 C. Torcia, *supra*, § 24, at 112; *compare, e. g., Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel in felony trials) *with Scott v. Illinois*, 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979) (right to counsel in misdemeanor trials), and had attained this position in federal court long before 1954 when the current version of § 7212(a) was adopted. *See Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (right to counsel in federal criminal prosecutions). Insofar as the merger doctrine has been justified as a means of preventing the harassment of a defendant brought about by successive prosecutions for the same conduct, the Double Jeopardy Clause would protect a defendant from the harassment otherwise covered by the merger rule. *See,*

ny if this meant that they were to be tried on a capital charge, and deprived, firstly, of the benefit of full defence by counsel; secondly, of a copy of the indictment; thirdly, of the means of compelling the attendance of their witnesses; fourthly, of the right to examine them on oath when they did attend; and, fifthly, in most cases, of the right to be bailed. The only advantage of trial for felony over that for misdemeanor was that the accused was allowed thirty-five (later twenty) preremptory challenges of

jurors. The early cases in which the plea was raised were either ones in which there was a procedural bar to an indictment for felony (if, for instance, the accused was a felon, he was a felon because he was an accessory, and accessories could not be tried until after the conviction of the principal), or they were cases in which it was most unlikely that the jury would convict on a capital charge." *Glazerbrook, supra*, 78 L.Q.Rev. at 572–73 (footnotes omitted).

e. g., *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) (Double Jeopardy Clause bars reprosecution for same conduct after conviction of a lesser included offense); *Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) (Double Jeopardy Clause bars reprosecution for same conduct after government has obtained a mistrial for the purpose of harassment). Finally, whether it is rational or irrational for Congress to have divided certain criminal conduct into several discrete offenses is not a matter that is fit for judicial scrutiny. " 'Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute.' " *Rubin v. United States,* —— U.S. ——, —— n.8, 101 S.Ct. 698, 702 n.8, 66 L.Ed.2d 633 (1981) (quoting

*TVA v. Hill,* 437 U.S. 153, 194, 98 S.Ct. 2279, 2301, 57 L.Ed.2d 117 (1978)). Absent a contention, not present here, that the statute charged against an accused is unconstitutional, ascertaining Congress' intent in enacting the statute is the beginning and the end of judicial inquiry.[7]

## D

In conclusion, the defendant's interpretation of § 7212(a) is untenable. "Proof" at the trial in this case that the defendant exercised force against Kostrzewski will not erase an otherwise valid conviction based upon proof that the defendant employed a threat of force.[8] The government's case does not disappear off the edge of the earth if the government goes further than it has to in establishing its proof.[9]

7. Indeed, once the meaning of § 7212(a) is discerned, it is difficult even to imagine any rational basis for importing the defendant's interpretation of the statute into the language of the provision. The statute under which a defendant is charged, along with the judicial gloss impressed upon the statute, establishes the conduct that Congress has outlawed. In any particular case, the only relevant elements of the offense, or defense, out of the entire universe of *actus reus* and *mens rea* elements that Congress could have banned are those that the prosecution must establish to prove its case or those that the accused may raise as a defense. These are the only "elements" toward which either side offers any "proof," in the technical sense of that term, because these are the only conditions determinative of criminal liability. Neither the government nor the accused can "prove" an issue not present in the case. Just as a defendant cannot be validly convicted on the basis of proof of charges never leveled against him, *De Jonge v. Oregon,* 299 U.S. 353, 362, 57 S.Ct. 255, 259, 81 L.Ed. 278 (1937), so too a defendant cannot escape an otherwise valid conviction by "proving" or "disproving" the existence of other charges never made. Once the elements of the offense and any defense to a criminal charge are determined, that determination cabins the ultimate issues for any particular statute to those issues alone, and it is on those issues alone that the accused's culpability turns. Therefore, it is difficult to imagine any rational basis for superimposing additional elements upon a statute such as § 7212(a).

Finally, even if the defendant could demonstrate that there was a rational basis for grafting his interpretation of § 7212(a) onto the act not attributable to the language, legislative history, or policies motivating the act, this Court

is without power to do so. "[W]ithin our federal constitutional framework the legislative power, including the power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them, resides with the Congress." *Whalen v. United States,* 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980). The separation of powers doctrine includes the principle that federal courts do not possess the inherent authority to manufacture crimes or criminal punishments. *Id.; United States v. Wiltberger,* 18 U.S. 35, 43, 5 Wheat. 76, 95, 5 L.Ed. 37 (1820); *United States v. Hudson,* 11 U.S. 31, 32–33, 7 Cranch 32, 33–34, 3 L.Ed. 259 (1812). "It is the legislature, not the court, which is to define a crime, and ordain its punishment." *United States v. Wiltberger, supra,* 18 U.S. at 43, 5 Wheat. at 95. Because the defendant's interpretation of § 7212(a) would impose a limitation upon that statute contrary to Congressional intent in defining the elements necessary for a conviction, this Court would be unable to superimpose the defendant's interpretation even if presented with a rational, noninterpretative reason for doing so. *See Rubin v. United States, supra,* —— U.S. at —— n.8, 101 S.Ct. at 702 n.8.

8. The Third Circuit Court of Appeals has already come to the same interpretation of § 7212(a) in *United States v. Johnson,* 462 F.2d 423, 427 (1972), *cert. denied,* 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1973).

9. This result is required regardless of whether the defendant's interpretation of 26 U.S.C. § 7212(a) is characterized as an inherent limitation on the government's proof of the elements of a misdemeanor offense or as an affirmative

## III

The defendant also argues that the government has acted "vindictively" by prosecuting this misdemeanor by a bill of information after declining to submit the evidence before the grand jury to a vote on the·question of whether it would return an indictment against the defendant for the same conduct alleged in the bill of information. Because the government has violated the constitutional ban on prosecutorial vindictiveness, according to the defendant, the bill of information must be dismissed.

## A

■ As an initial matter, it is clear that the government plainly possesses the authority to prosecute this case by a bill of information. The government has charged the defendant with a misdemeanor, and the government may proceed under a bill of information rather than an indictment on a misdemeanor charge. F.R.Crim.P. 7(a); *Duke v. United States*, 301 U.S. 492, 57 S.Ct. 835, 81 L.Ed. 1243 (1937); 1 C. Wright, *supra*, § 121, at 212. Rule 7(a) of the Federal Rules of Criminal Procedure states without qualification that the government may pursue a misdemeanor conviction under a bill of information and does not impose any requirements or conditions upon the exercise of that charging instrument for prosecuting a misdemeanor offense.

■ The government's failure to receive an indictment from the grand jury, for whatever reason, does not disable the government's current efforts under this bill of information. The government may prosecute under a new indictment returned by a second grand jury despite the first grand jury's refusal to return an indictment on those charges when presented with the same evidence. *United States v. Thompson*, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333 (1920); *United States v. Barone*, 584 F.2d 118, 123 (6th Cir. 1978); *United States v. Cox*, 342 F.2d 167, 192 (5th Cir.) (*en banc*) (Wisdom, J., concurring specially), *cert. de-*

*nied*, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965); *Robinson v. United States*, 284 F.2d 775, 776 (5th Cir. 1960). *Accord Ex parte United States*, 287 U.S. 241, 250–51, 53 S.Ct. 129, 132, 77 L.Ed. 283 (1932). The government may also prosecute by an indictment where a prior complaint (or information) had been dismissed at a preliminary hearing. F.R.Crim.P. 5.1(b); *United States ex rel. Rutz v. Levy*, 268 U.S. 390, 45 S.Ct. 516, 69 L.Ed. 1010 (1925); *Morse v. United States*, 267 U.S. 80, 82–86, 45 S.Ct. 209, 211, 69 L.Ed. 522 (1925); *United States v. Dobbs*, 506 F.2d 445, 447 (5th Cir. 1975); *United States v. Kysar*, 459 F.2d 422, 423–24 (10th Cir. 1972); *United States v. Grimes*, 426 F.2d 706, 708 (5th Cir. 1970) (per curiam). Similarly, the government may file a second bill of information after an initial bill has been dismissed. F.R. Crim.P. 5.1(b). In each of these situations, the government is allowed a second chance at bat because of "the absolute right of the United States to prosecute," *United States v. Thompson, supra*, 251 U.S. at 412, 40 S.Ct. at 291, *id.* at 415, 40 S.Ct. at 292, and because the pretrial dismissal of an indictment or information in one action does not give rise to a *res judicata* or Double Jeopardy defense in another action involving a prosecution for the same offense. *See Robinson v. United States, supra*, 284 F.2d at 776. *Accord Morse v. United States, supra*, 267 U.S. at 85, 45 S.Ct. at 210 ("a judgment in a preliminary examination discharging an accused person for want of probable cause is not conclusive upon the question of his guilt or innocence and constitutes no bar to a subsequent trial in the court to which the indictment is returned.") These principles are applicable where the government prosecutes a misdemeanor by a bill of information after failing to obtain an indictment from a grand jury. The "absolute right of the United States to prosecute" is no less absolute merely because the government elects to prosecute a misdemeanor rather than a felony; the failure to obtain an

---

defense to a misdemeanor prosecution, and regardless of whether the defendant frames his argument in terms of a variance between the

pleadings and the proof or in terms of the sufficiency of the evidence to charge or to convict.

indictment from the grand jury is no more a "dismissal" because the grand jury rather than a magistrate failed to return a charge against the defendant; and the government's decision to institute its second attempt to prosecute the defendant by information rather than by indictment is as irrelevant to the course of the past proceedings as would be a governmental decision to begin the second round with an indictment. In none of the four possible situations is the government disabled from reinstituting criminal charges against a defendant, whether felony or misdemeanor charges and whether under an indictment or an information, because of its failure to obtain a charging instrument during the prior proceedings.

An additional factor present in this case is the difference between the charge presented to the grand jury and the charge listed in the bill of information. The government presented evidence to the grand jury for its consideration in determining whether to charge the defendant with a violation of 18 U.S.C. § 111 but the charge listed in the bill of information is a misdemeanor violation of 26 U.S.C. § 7212(a). While the factual basis for these two charges may be the same, each statute requires proof of an element different from the other.[10] Therefore, it cannot be said with any degree of assurance that the government's failure to obtain an indictment from the grand jury is at all relevant to its authority to initiate this prosecution.

Because the government possesses the authority to bring this misdemeanor prosecution under a bill of information, the only remaining question is whether the government is barred from exercising this authority in the circumstances of this case.

### B

■ This question implicates two intersecting and fundamentally important interests that the Constitution seeks to protect, both of which were articulated by the Supreme Court three terms ago in *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663,

54 L.Ed.2d 604 (1978). On the one hand, "[i]n our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id.* at 364, 98 S.Ct. at 668 (footnote omitted). But, on the other hand, "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Id.* at 363, 98 S.Ct. at 667. Therefore, while the government's decisions regarding the prosecution of individuals for crime is normally not subject to judicial oversight, the Due Process Clause imposes a restriction on that charging discretion prohibiting the executive branch from exercising its authority in a "vindictive" fashion for the sole purpose of punishing a person because of his exercise of his legal rights.

■ "Vindictiveness," in this sense, is not defined in terms of society's desires or actions to punish the guilty, in terms of the harm inflicted upon a defendant's chances for success in the case against him, or in terms of a prosecutor's personal spite or ill will toward an otherwise validly chargeable defendant. Vindictiveness could hardly be defined so broadly in a legal system that recognizes the legitimacy of retribution as a justification for punishment, *Gregg v. Georgia*, 428 U.S. 153, 183–84, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, & Stevens, JJ.); *id.* at 226, 96 S.Ct. at 2949 (White, J., concurring in the judgment) (incorporating by reference *Roberts v. Louisiana*, 428 U.S. 325, 350–56, 96 S.Ct. 3001, 3016, 49 L.Ed.2d 974 (1976) (White, J., dissenting)), that strives to ensure that "guilt shall not escape," *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), and that permits and encourages the government to "prosecute with earnestness and vigor," to "use every legitimate means to bring about a just [conviction]," and to "strike hard blows" to obtain one. *Id.* The "vindictiveness" prohib-

---

**10.** *See* note 4, *supra*; note 33, *infra*.

ited by the constitution is the imposition of punishment, as that term has historically been understood in the criminal law, against a defendant for the purpose of retaliating against him because he has exercised his legal rights rather than for the purpose of imposing a sanction upon him for the crimes he has committed. *See Bordenkircher v. Hayes, supra*, 434 U.S. at 363, 98 S.Ct. at 667, *see post* at 316–319. Both the United States Supreme Court and the Fifth Circuit Court of Appeals have stressed the importance of protecting the government's right to strike "hard blows" while ferretting out and quashing its authority to strike "foul ones," *Berger v. United States, supra*, 295 U.S. at 88, 55 S.Ct. at 633, and, beginning with *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), have developed a set of principles designed to accommodate both interests. To decide the question raised by the defendant, it is necessary to examine these cases.

1. *North Carolina v. Pearce and Blackledge v. Perry.*

The Supreme Court first articulated the principle that the Due Process Clause bars vindictiveness in *North Carolina v. Pearce*. In *Pearce*, one of the defendants had received a greater sentence upon retrial after his original conviction and sentence were reversed on appeal. The Supreme Court held that, although the double jeopardy and equal protection clauses did not impose an absolute bar to setting a more severe sentence upon reconviction, the due process clause did impose a limit on such resentencing by barring the imposition of a greater sentence upon a defendant who overturned his original conviction as a punishment for having been successful. Specifically, the *Pearce* court held that a judge who had originally sentenced a defendant could not impose a more severe punishment upon resentencing the defendant then he had originally imposed unless the new sentence were based upon "objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding" affirma-

tively appearing in the record. *Id.* at 726, 89 S.Ct. at 2081. This holding was designed to accommodate the state's interest in following "the 'prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime,' " *id.* at 723, 89 S.Ct. at 2079 (quoting *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949)), by permitting state judges to impose "a new sentence, whether greater or less than the original sentence, in the light of events subsequent to the first trial that may have thrown new light upon the defendant's 'life, health, habits, conduct, and mental and moral propensities,' " *id.* (quoting *Williams v. New York, supra*, 337 U.S. at 245, 69 S.Ct. at 1082), while also safeguarding a defendant's interest in avoiding "a heavier sentence ... [received] for the explicit purpose of punishing [him] for his having succeeded in getting his original conviction set aside." *Id.* at 723–24, 89 S.Ct. at 2079–2080. To protect defendants from the *in terrorem* effect of the *sub rosa* continuation of this practice, the *Pearce* court adopted a prophylactic rule prohibiting the imposition of more severe sentences unless done in accordance with the requirements set out in the *Pearce* opinion.

In *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), the Supreme Court was faced with a similar problem but this time the focus shifted to the filing by the prosecutor of a more serious charge against a defendant after he had sought to overturn his original conviction and sentence. After the defendant had been convicted of a misdemeanor assault charge in a state court of limited jurisdiction, he exercised his statutory right to a trial *de novo* before a different judge in a state court of general jurisdiction. The prosecutor responded to the defendant's appeal by filing a more serious felony assault charge covering the identical conduct against the accused. Applying *Pearce*, the court held that the Due Process Clause also barred the prosecutor from retaliating against a defendant by filing more serious charges covering the same conduct after

the defendant has sought to overturn his conviction. *Id.* at 27–29, 94 S.Ct. at 2102–2103. In addition, because a prosecutor had both the opportunity and a strong incentive to "up the ante" in such cases in order to deter such appeals, the court concluded that the likelihood of such a practice was at least as great as the similar practice condemned in *Pearce.* Therefore, the court imposed a prophylactic rule similar to the one adopted in the *Pearce* case. *Id.* at 29 & n.7, 94 S.Ct. at 2103 & n.7.

■ *Pearce* and *Blackledge* established the rule that the due process clause forbids the imposition of a criminal punishment upon a defendant because of his exercise of a legal right. The punishment forbidden in *Pearce* was the imposition of a more severe sentence upon reconviction while the punishment forbidden in *Blackledge* was the filing of more severe charges which, by definition, carried a more severe penalty upon conviction. Both cases also recognized, however, that the state had competing interests that could arise in situations similar to those in *Pearce* and *Blackledge.* *See North Carolina v. Pearce, supra,* 395 U.S. at 723, 89 S.Ct. at 2079 (recognizing trial court's interest in tailoring the punishment to fit the offender based upon intervening events); *Blackledge v. Perry, supra,* 417 U.S. at 29 n.7, 94 S.Ct. at 2103, n.7 (recognizing prosecutor's interest in charging defendant for crimes arising between first and second trials). But in neither case was the court presented with a situation in which it had to balance the competing interests because the situations present in both cases were stark depictions of the state's imposition of a criminal punishment as the response to and for the sole purpose of punishing a defendant's exercise of his rights. *Pearce* and *Blackledge* hardly exhaust the variety of different situations that could arise, however. Because of the variety of situations in which a trial judge or a prosecutor would legitimately wish to sentence or prosecute a defendant for crimes proven or alleged, despite the intervening act of a defendant's exercise of a procedural right available to him, a simple *post hoc ergo propter hoc* rule would not

take into consideration the legitimate interests at stake on the state's side of the balance. Neither *Pearce* nor *Blackledge* established such a rule and left the balance of competing interests to other cases in which such balancing was necessary.

In a series of cases following *Pearce* and *Blackledge,* the Fifth Circuit has adopted a procedure for reviewing the government's exercise of its charging discretion to determine whether the government has legitimately exercised its authority in a constitutionally forbidden manner. Because this test was designed to cover the multitude of situations of which *Pearce* and *Blackledge* were only two particular instances, it is necessary to examine this rule.

### 2. The Fifth Circuit Rule

The rule in this circuit to assess the validity of the government's exercise of its charging authority has developed over a series of cases attempting to accommodate the state's constitutionally protected authority to prosecute defendants for crime and the defendant's constitutional right as set forth in the *Blackledge* case. *See Hardwick v. Doolittle,* 558 F.2d 292 (5th Cir.), *on petition for rehearing and rehearing en banc,* 561 F.2d 630 (1977) (per curiam), *cert. denied,* 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978); *Jackson v. Walker,* 585 F.2d 139 (5th Cir. 1978); *Miracle v. Estelle,* 592 F.2d 1269 (5th Cir. 1979); *United States v. Thomas,* 593 F.2d 615 (5th Cir.), *modified on rehearing,* 604 F.2d 450 (1979) (per curiam), *appeal after remand,* 614 F.2d 436 (1980); *United States v. Shaw,* 615 F.2d 251 (5th Cir. 1980) (per curiam). This test sets forth both the elements of proof of and defense to a claim of prosecutorial vindictiveness as well as the allocation of burdens and order of proof on this claim.

■ The defendant bears the burden of establishing a *prima facie* case of prosecutorial vindictiveness. This burden is not onerous, however, and the defendant may satisfy this burden by demonstrating that, after he has successfully challenged his first conviction or sentence, the government in-

stituted new charges which increased the severity of the original charge[11] either by escalating the original charge, for example, from robbery to armed robbery, or by increasing the number of offenses against the accused, for example, by adding a second robbery charge. The defendant's establishment of a *prima facie* case of vindictiveness, in effect, creates a presumption that the government did act vindictively in bringing the second prosecution. The nature of this presumption varies according to the balance struck between the government's interests in enforcing the law and allocating wide discretion to individual prosecutor's to make charging decisions, and the defendant's interests in being free from both actual vindictiveness and the apprehension of vindictiveness as the consequence of challenging his original conviction.[12] Where the defendant's interests outweigh the government's interests, the presumption created by the defendant's es-tablishment of a *prima facie* case is irre-buttable, and the defendant is entitled to prevail based entirely upon his initial showing. This occurs where the government baldly escalates the original charge as in *Blackledge*. But where the balance weighs in favor of the government, as occurs where the escalation of the second charge was possible only because of events occurring between the first and second prosecutions[13] or where the second charge accuses the defendant of "different and distinct" offenses from the first charge, even despite a common origin in the same "spree of activity,"[14] the government is entitled to rebut the presumption of vindictiveness by going forward to demonstrate legitimate, nonvindictive reasons for the second charge.[15] In these situations, if the government fails to come forward with any such reasons[16] or fails adequately to rebut the presumption of vindictiveness,[17] the defendant is entitled

11. "[T]he *sine qua non* of a prosecutorial vindictiveness claim is that the second charge is in fact harsher than the first." *Jackson v. Walker*, 585 F.2d 139, 146 (5th Cir. 1978) (footnote omitted). *Accord Miracle v. Estelle*, 592 F.2d 1269, 1275 (5th Cir. 1979); *Hardwick v. Doolittle*, 558 F.2d 292, 299–300 (5th Cir.), *on petition for rehearing and rehearing en banc*, 561 F.2d 630 (1977) (per curiam), *cert. denied*, 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978). *But see* note 19 and accompanying text, *infra*.

12. *See Jackson v. Walker*, supra, 585 F.2d at 145.

13. *See Blackledge v. Perry*, 417 U.S. 21, 29 n.7, 94 S.Ct. at 2103, n.7 (1974).

14. *See United States v. Thomas*, 593 F.2d 615, 624 (5th Cir.), *modified on rehearing*, 604 F.2d 450 (1979) (per curiam), *appeal after remand*, 617 F.2d 436 (1980); *Hardwick v. Doolittle*, 558 F.2d 292, 302 (5th Cir.), *on petition for rehearing and rehearing en banc*, 561 F.2d 630 (1977) (per curiam), *cert. denied*, 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978).

15. There are numerous ways in which the prosecution can sustain its burden. "An increase in the severity or number of charges if done without vindictiveness may be easily explained. For example, evidence of the additional crimes may not have been obtained until after the first indictment or information is filed, or the additional crime may not be complete at the time charges are first brought. And a prosecutor may, without explanation, refile charges against a defendant whose bargained-for guilty plea to a lesser charge has been withdrawn or overturned on appeal, provided that an increase in the charges is within the limits set by the original indictment. Other explanations which would negate vindictiveness could include mistake or oversight in the initial action, a different approach to prosecutorial duty by the successor prosecutor, or public demand for prosecution on the additional crimes allegedly committed. The list is intended to be illustrative rather than exhaustive." *Hardwick v. Doolittle*, 558 F.2d 292, 301 (5th Cir.), *on petition for rehearing and rehearing en banc*, 561 F.2d 630 (1977) (per curiam), *cert. denied*, 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978) (footnotes omitted).

16. *See Miracle v. Estelle*, 592 F.2d 1269, 1277 (5th Cir. 1979) ("Moreover, at no time during these proceedings has the state offered an explanation for 'upping the ante' against Miracle. This silence lends some weight to Miracle's contention that the only likely motive was vindictiveness.") (footnote omitted).

17. *See Jackson v. Walker*, 585 F.2d 139, 145 n.9 (5th Cir. 1978) ("Even under *Hardwick*, a court does not have to see specific evidence of the intent of the prosecutor to retaliate to determine there is actual vindictiveness. It is enough that the defendant show the reasonable apprehension of vindictiveness and that the prosecutor then fails to rebut this *prima facie* showing of actual vindictiveness with reasonable explanations for the increased charge.").

to a judgment in his favor based upon the presumption created by his establishment of a *prima facie* case. But if the government successfully carries its burden of rebutting the presumption, the defendant must then demonstrate actual vindictive motivation by the government to prevail on his claim.[18] Alternatively, where the government institutes a second prosecution against a defendant who has had his first conviction set aside but who cannot establish a *prima facie* case because the second charge carries a less severe penalty than the first, the defendant may still challenge the second prosecution as vindictive but must demonstrate actual vindictive motivation by the government.[19]

This test was premised upon an interpretation of *Blackledge* and, by implication, *Pearce* that focused upon the *in terrorem* effect on a defendant's exercise of his rights to challenge his conviction which would result from permitting the government unbridled discretion to reprosecute a defendant for any alleged criminal activity after the defendant has had that first conviction set aside. *See Jackson v. Walker, supra,* 585 F.2d at 144–45. That interpretation of *Pearce* and *Blackledge* proved erroneous, however, because the Supreme Court stated in the *Bordenkircher* case that "the due process violation in cases such as *Pearce* and *Perry* lay not in the possibility that a defendant might be deterred from the exercise of a legal right ... but rather in the danger that the State might be retaliating against the accused for lawfully attacking his conviction." *Bordenkircher v. Hayes, supra,* 434 U.S. at 363, 98 S.Ct. at 667. The Fifth Circuit has noted that the Supreme Court's decision in *Bordenkircher* may have "undermined" the balancing test posited in its earlier cases, *see United States v. Thomas, supra,* 617 F.2d at 438 n.1, and, therefore, this Court must also consider the applicability of *Bordenkircher* to this case.

### 3. *Bordenkircher v. Hayes*

In *Bordenkircher*, the Supreme Court affirmed a state conviction under an indict-ment charging the defendant as a habitual criminal even though the prosecutor had added the recidivist count only after the defendant refused to plead guilty to a simple felony charge and, instead, stood upon his right to trial on the simple felony charge. Interpreting *Pearce* and *Blackledge* to forbid the state from punishing a defendant for having his conviction set aside, the Supreme Court held that both cases were inapplicable to the plea bargaining context because "in the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." *Bordenkircher v. Hayes, supra,* 434 U.S. at 363, 98 S.Ct. at 667. Because the state was entitled to prosecute Hayes on the recidivist charge and was not required to plea bargain, he could not have complained had the state decided to proceed in that manner. The state did not act unconstitutionally by proceeding in the manner it chose to, however, because "by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forego his right to plead not guilty." *Id.* at 363, 98 S.Ct. at 667. Consequently, any pressure exerted by the government upon an accused resulting from the government's "threat" to prosecute the defendant for crimes he allegedly committed should any plea negotiations terminate inconclusively was recognized as an inevitable by-product of the constitutionally legitimate plea bargaining process. The order the prosecution lodged these validly chargeable offenses against the accused was also irrelevant because the desire to induce the defendant to plead guilty was not an "unjustifiable" or "arbitrary" factor upon which a prosecutor could base his charging decisions since the establishment of the constitutional legitimacy of plea bargaining also legitimized this exercise of the government's

---

**18.** *See Id.* at 145.

**19.** *Id.* at 146 n.12.

charging discretion. In short, the defendant's refusal to accept a benefit from the state in the form of a lesser charge than could have been lodged against him in return for his entry of a plea of guilty did not transform the government's decision to prosecute him for offenses for which he was otherwise legitimately subject to prosecution into a punishment for his exercise of his rights. "[T]he course of conduct engaged in by the prosecutor ... no more than openly presented the defendant with the unpleasant alternatives of foregoing trial or facing charges on which he was plainly subject to prosecution ...." *Id.* at 365, 98 S.Ct. 669. Because the actions by the government to bring about either result were not unconstitutional, the actions by the government forcing the defendant to make the choice between these alternatives did not amount to a penalty upon the choice he elected.

 *Bordenkircher* refines the Due Process principle identified in *Pearce* and *Blackledge*, and the Fifth Circuit cases following those decisions, both substantively and methodologically in several important respects. To begin with, *Bordenkircher* focuses that principle upon the danger that a defendant has been punished in retaliation for doing what the law allows him to do. *Bordenkircher* makes clear that the harm that the Constitution seeks to avert is the imposition of punishment upon a defendant in retaliation for his exercise of his legal rights rather than the deterrent effect upon a defendant's decision whether to exercise those rights. This doctrine, then, is an expression of the principle that a person cannot be criminally punished for conduct that has not been made criminal and, in fact, has expressly been made entirely lawful.

 The principle that a person can be found guilty of a crime and punished for his acts only if the state beforehand has made the commission of those acts a crime and has authorized punishment to be imposed upon proof that a person has in fact committed those acts is at the heart of the "rule of law" characteristic of Anglo-American jurisprudence. J. Hall, General Principles of Criminal Law 28 (2d ed. 1960); W. LaFave & A. Scott, *supra*, § 2, at 7; H. Packer, The Limits of the Criminal Sanction 79–102 (1968).[20] Expressed in the maxim *nulla poena sine lege, nulla poena sine crimine, nullum crimen sine poena legali,* "[t]he essence of this principle of legality is limitation on penalization by the State's officials, effected by the prescription and application of specific rules." J. Hall, *supra,* at 28 (emphasis omitted). The principle of legality in this nations criminal law has historically found expression in the criminal law rule of strict construction of criminal statutes,[21] and in the constitutional principles forbidding *ex post facto* operation of the criminal law,[22] vague criminal

---

**20.** The formulation of this principle is generally attributed to Fuerbach, J. Hall, General Principles of Criminal Law 34 (2d ed. 1960), but the history of this principle has been traced to Greek and Roman legal systems. *Id.* at 29–30. This principle also figured prominently in the development of the English common law from a decisional to a statutory system of criminal law. *Id.* at 31–32.

**21.** *See, e. g., Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980).

**22.** *See, e. g., Weaver v. Graham,* —— U.S. ——, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) ("The *ex post facto* prohibition forbids the Congress and the States from enacting any law 'which imposes a punishment for an act which is not punishable at the time it was committed; or imposes additional punishment to that then prescribed.' ") (quoting *Cummings v. Missouri,*

71 U.S. (4 Wall.) 277, 325–26, 18 L.Ed. 356 (1866)) (footnote omitted); *Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 2297, 53 L.Ed.2d 344 (1977) (" 'It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto.*' ") (quoting *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925)); *Kring v. Missouri,* 107 U.S. 221, 230–31, 2 S.Ct. 443, 451, 27 L.Ed. 506 (1883) (" 'No one can be criminally punished in this country, except according to a law prescribed for his government by the sovereign authority, before the imputed offence was committed, and which existed as a law at that time.' ") (quoting *Har-*

statutes,[23] "courts from depriving persons of liberty or property as punishment for criminal conduct except to the extent authorized by state [or federal] law," [24] and,

*tung v. New York,* 22 N.Y. 95, 104 (1860)) (emphasis omitted). Although the *Ex Post Facto* Clauses of the federal constitution are applicable by their own force only to legislative acts and not to judicial decisions, *see Marks v. United States,* 430 U.S. 188, 191, 97 S.Ct. 990, 992, 51 L.Ed.2d 260 (1977); *Frank v. Mangum,* 237 U.S. 309, 344, 35 S.Ct. 582, 593, 59 L.Ed. 969 (1915), the rationales underlying the *ex post facto* prohibition—"assur[ing] that legislative acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed," *Weaver v. Graham, supra,* —— U.S. at ——, 101 S.Ct. at 964, and "restraining arbitrary and potentially vindictive legislation," *id.* at ——, 101 S.Ct. at 964—are equally applicable through the Due Process Clauses of the Fifth and Fourteenth Amendments to judicial action. *See Marks v. United States, supra,* 430 U.S. at 191–92, 97 S.Ct. at 992–993 (Fifth Amendment); *Bouie v. City of Columbia,* 378 U.S. 347, 353–54, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964) (Fourteenth Amendment). As the Supreme Court wrote in *Bouie* and reiterated in *Marks:* "[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids . . . . If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction."

**23.** "It is settled that, as a matter of due process, a criminal statute that 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' *United States v. Harriss,* 347 U.S. 612, 617 [74 S.Ct. 808, 811, 98 L.Ed. 989] (1954), or is so indefinite that 'it encourages arbitrary and erratic arrests and convictions,' *Papachristou v. Jacksonville,* 405 U.S. 156, 162 [92 S.Ct. 839, 843, 31 L.Ed.2d 110] (1972), is void for vagueness. *See generally Grayned v. City of Rockford,* 408 U.S. 104, 108–109 [92 S.Ct. 2294, 2298, 2299, 33 L.Ed.2d 222] (1972)." *Colautti v. Franklin,* 439 U.S. 379, 390, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979). *See generally* Note, The Void-For-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67 (1960). This same rule applies to "common law crimes" as well as statutorily defined offenses. *See Ashton v. Kentucky,* 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966). *See* note 24, *infra.*

**24.** *Whalen v. United States,* 445 U.S. 684, 689 n.4, 100 S.Ct. 1432, 1437, n.4, 63 L.Ed.2d 715 (1980). In *Whalen,* the court reaffirmed the principle first expressed in *United States v. Hudson,* 11 U.S. 21, 7 Cranch 32, 3 L.Ed. 259 (1812), that the federal constitutional principle of separation of powers forbids a federal court from defining crimes or imposing punishments in the absence of Congressional legislation, and added that such judicial action would violate the Double Jeopardy Clause as well. The court also noted, however, that because the federal separation of powers principle is not incumbent upon the states, neither it nor the Double Jeopardy Clause may bar such judicial action by a state court, but that the Fourteenth Amendment Due Process Clause "would presumably" do so. Although the court did not expand upon this point, the court's own prior doctrines support the *Whalen* court's statements.

Federal courts have been disabled from creating "common law crimes" since the *Hudson* case for reasons that closely paralleled the rationales underlying the *Ex Post Facto* Clause and the vagueness doctrine, as well as the separation of powers principle. Compare *Whalen, supra,* and *Hudson, supra,* with notes *22 & 23, supra.* But, although "the concept of the common-law crime was in retreat during the whole of the 19th century," L. Friedman, A History of American Law 254 (1973), some state courts, following some of the English common law courts, have held that they possessed the authority to declare as criminal and punish conduct *contra bonos mores* despite the absence of a statute making that conduct a crime. *See* G. Williams, Criminal Law: The General Part § 189 (2d ed. 1961) (English common law); Brownlie & Williams, Judicial Legislation in Criminal Law, 42 Can.B.Rev. 561 (1964) (same); Jackson, Common Law Misdemeanors, 6 Camb.L.J. 193 (1937) (same); W. LaFave & A. Scott, Handbook on Criminal Law § 9 (1972) (American common law); Note, Common Law Crimes in the United States, 47 Colum.L.Rev. 1332 (1947) (same). The authority of the courts to create common law crimes has been challenged on the grounds that judicial exercise of such power is contrary to the rule of law, Note, [1961] Camb.L.J. 144, 146; Note, 24 Modern L.Rev. 626, 631 (1961), is an "usurpation of a properly legislative function," Note, 75 Harv. L.Rev. 1652, 1654 (1962) (footnote omitted), and is "objectionable for the same reasons that render unconstitutional an excessively vague statute, and violates the notion of fairness reflected in the constitutional ban on *ex post facto* legislation," *id.* at 1655 (footnotes omitted); H. Packer, The Limits of the Criminal Sanction 80 (1968). But in this context, the questions whether a state court has the authority to create a common law crime and whether there are any federal constitutional limitations on that authority must be clearly distinguished.

The first question relates to the proper allocation of responsibility in the state system for defining crimes and setting punishment for

perhaps, cruel and unusual punishments.[25] In the absence of a rule of law making the

them. The resolution of this issue is purely a matter of state law and, by itself, does not raise any federal constitutional issue. The second question, however, does implicate the protections of the federal constitution, by necessity. In *Whalen*, the court declared that the Due Process Clause may limit a state court's authority to create, in effect, common law crimes. Sitting astride the Due Process Clause, however, are the *Ex Post Facto* Clause and the vagueness doctrine. *See* notes *22 & 23, supra.* The court has declared that the latter two doctrines are based on a common principle—"the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties," *Marks v. United States,* 430 U.S. 188, 191, 97 S.Ct. 990, 992, 51 L.Ed.2d 260 (1977)—and that these principles can be enforced through the Due Process Clause against state judicial action creating crimes or penalties where none existed before. *See* note 22, *supra.* Therefore, the *Whalen* court's statement describing the constitutional limitations on state power to define crime was wholly congruent with the doctrine articulated in *Bouie* and *Marks.*

**25.** The "cruel and unusual punishments" clause of the Eighth Amendment was taken from Art. I, § 9, of the Virginia Declaration of Rights, which in turn had been taken verbatim from the Tenth Clause of the English Bill of Rights of 1689. *Rummel v. Estelle,* 445 U.S. 263, 287, 100 S.Ct. 1133, 1146, 63 L.Ed.2d 382 (1980) (Powell, J., dissenting); Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif.L.Rev. 839, 840 (1969). While "[t]he English version appears to have been directed against punishments unauthorized by statute and beyond the jurisdiction of the sentencing court, as well as those disproportionate to the offense involved," *Gregg v. Georgia,* 428 U.S. 153, 169, 96 S.Ct. 2909, 2923, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, & Stevens, JJ.), "[t]he American draftsmen, who adopted the English phrasing in drafting the Eighth Amendment, were primarily concerned, however, with proscribing 'tortures' and other 'barbarous' methods of punishment." *Id.* at 169–70, 96 S.Ct. at 2923. "[T]he legislative history of the Eighth Amendment is not extensive," *Rummel v. Estelle, supra,* 445 U.S. at 287, 100 S.Ct. at 1146, however, and in reaching its conclusion regarding the Framer's intentions the *Gregg* court relied upon the historical research done by Professor Granucci and the statements made by individuals in the state ratifying conventions. *See Gregg v. Georgia, supra,* 428 U.S. at 169–70 & n.17, 96 S.Ct. at 2923 & n.17. Neither source, however, provides support for the conclusion that the Framers intended to *exclude* from the compass of the Eighth Amendment a prohibition against the judicial imposition of punishments not au-

conduct charged against a person a crime and authorizing the government to impose

thorized beforehand by the Congress. In his article, Professor Granucci focuses on the Framers' misinterpretation of the term "cruel" to refer solely to the manner or method of imposing punishment. Granucci, *supra,* 57 Calif.L.Rev. at 839–42, 860–68. But, after having demonstrated that this interpretation was not part of the original meaning of the English Bill of Rights, he then failed to consider whether the Framers intended the Cruel and Unusual Punishments Clause to incorporate a bar to a court's imposition of a non-authorized punishment *in addition to* the prohibition of torturous methods of inflicting legislatively authorized penalties. The statements made in the state ratifying conventions also do not support the conclusion that the English understanding was rejected in favor of a different American interpretation. These statements were merely made in support of the Amendment to ensure that a particular evil would be banished from the American scene, and not, at the same time, to banish a blessing of English liberty that every colonist had enjoyed before the Revolution. The absence of statements in the Congressional debates on the Constitution or in the ratifying conventions in support of the Cruel and Unusual Punishments Clause on the same ground that spurred Parliament into action on the English Bill of Rights, cannot be taken to imply opposition by the Framers to the English understanding of the clause. *Cf. Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 578–79 & nn. 14 & 15, 100 S.Ct. 2814, 2828–29 & nn. 14 & 15, 65 L.Ed.2d 973 (1980) (plurality opinion) (absence of a defined constitutional right of the public to attend criminal trials or contemporary statements in support of such a right does not indicate that the Framers intended to exclude such a right); *Bridges v. California,* 314 U.S. 252, 265, 62 S.Ct. 190, 194, 86 L.Ed. 192 (1941) ("There are no contrary implications in any part of the history of the period in which the First Amendment was framed and adopted."). There is substantial historical support for the proposition that the Colonists were concerned with the imposition of criminal punishment for acts not declared criminal beforehand. *See* Goebel, King's Law and Local Custom in Seventeenth Century New England, 31 Colum.L.Rev. 416, 430–32, 440 n.45 (1931); Nelson, Emerging Notions of Modern Criminal Law in the Revolutionary Era: An Historical Perspective, 42 N.Y.U.L.Rev. 450, 466–67 (1967); *cf.* Westen, The Compulsory Process Clause (pt. 1), 73 Mich.L.Rev. 71, 91 (1974) (English common law applicable to colonies). The Supreme Court has never examined this question because federal courts have never had the authority to create "common law" crimes, *see* note 24, *supra,* and because the court's decision in *Bouie v. City of Columbia,* 378 U.S.

a punishment upon a person proven to have that conduct, a person cannot be criminally punished for having engaged in that conduct because he would not have violated any penal law.

■ *Pearce* established a part of this principle as a matter of federal constitutional law. The Due Process principle identified in *Pearce* and refined in *Bordenkircher* forbids the government from imposing a criminal punishment upon a person as the penalty for his exercise of a procedural right available to him. The presence of a constitutional, statutory, or decisional procedural right conclusively establishes that procedure as lawful and disentitles the government from imposing a punishment upon any person exercising that right. *Pearce* essentially adopts this rule as a matter of federal constitutional law and *Bordenkircher* strictly focuses the application of this principle on the imposition of punishment upon a defendant's exercise of his rights.[26]

■ Second, *Bordenkircher* refines the causal relationship that must exist between the defendant's exercise of his rights and the prosecutor's charging decision in order for a violation of the Due Process Clause to be shown. Not every action the government takes following a defendant's exercise of his rights constitutes "retaliation." *Pearce* does not adopt a *post hoc ergo propter hoc* relationship as the test for a Due Process violation. There must be some causal connection between the defendant's exercise of his rights and the government's charging decision. Otherwise, the government's ability to prosecute a defendant for crime would be subject to the whims of the defendant and his ability either to raise even specious legal issues in his defense or to engage in conduct facially related to but fundamentally unconnected with

the conduct forming the basis for his prosecution. The Due Process Clause also does not adopt a test that focuses on the question of whether the government exercised its charging discretion simply "because of" a defendant's exercise of his rights. This test would be sufficient to explain the results in *Pearce* and *Blackledge* but is inadequate to explain the result in *Bordenkircher*. Although the state's decision to prosecute Hayes as a recidivist was caused by his exercise of his right to a trial on the simple felony count, there was no retaliation in *Bordenkircher*, in part, because the state could have prosecuted Hayes as a recidivist in the absence of any plea negotiations at all. The state could have filed a recidivist charge against Hayes at the outset and thereafter refused to offer him a plea bargain to a lesser offense at all because the state is not constitutionally required to plea bargain with a defendant. *See Corbitt v. New Jersey*, 439 U.S. 212, 223, 99 S.Ct. 492, 499, 58 L.Ed.2d 466 (1978); *Weatherford v. Bursey*, 429 U.S. 545, 561, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977). That the events in *Bordenkircher* did not follow this scenario was, according to the Supreme Court, irrelevant to the constitutional issue. *Bordenkircher v. Hayes, supra*, 434 U.S. at 360–61, 98 S.Ct. at 666. *Bordenkircher*, therefore requires a much higher causal relationship between the defendant's exercise of his rights and the government's actions in bringing additional charges against him. The "retaliation" barred by the Due Process Clause does not exist where the government exercises its charging discretion simply "because of" the defendant's exercise of his rights but instead exists only where the government would not have exercised its charging authority "but for" the defendant's exercise of his rights. Only where the government's actions can be traced solely to the defendant's exercise of his rights can

347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964)—which essentially forbids this judicial action, *see* note *24, supra*—was handed down only two years after the court held that the Eighth Amendment was applicable to the states in *Robinson v. California*, 379 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

**26.** Several commentators have offered alternative explanations of *Bordenkircher, e. g.,* McCoy & Mirra, Plea Bargaining as Due Process in Determining Guilt, 32 Stan.L.Rev. 887, 908–26 (1980), but none of them are persuasive.

the requisite causal connection be established.

▬▬▬ Third, even where "but for" causation can be established, that causation must find its origin in a purpose by the government to punish a defendant solely as a retaliation for the defendant's exercise of his rights. The government is entitled to prosecute a defendant for crimes he allegedly committed even though some otherwise lawful action by the defendant brought his actions to the government's attention or prompted the government to act. Where the government exercises its charging authority in order to advance a legitimate interest apart from the defendant's actions, the government cannot be said to have retaliated against "a pesky defendant,"[27] notwithstanding a "but for" causal relationship between the parties' acts. The particular facts in *Bordenkircher* demonstrated "but for" causation but the state's actions were not unconstitutional because its motivation could adequately be attributed to a legitimate desire to induce Hayes to plead guilty and to charge him for crimes for which he was clearly subject to prosecution. Similarly, a defendant's exercise of his right to testify at his trial may provide the predicate for "but for" causation should the defendant later be prosecuted for perjury. But the government is legitimately entitled to prosecute the defendant for perjury in such a case despite the causal connection between the defendant's and its own actions because the government's actions can be attributed to a desire to enforce the law rather than any purpose to punish the defendant because he has exercised a right. *Cf. United States v. Havens*, 446 U.S. 620, 626–27, 100 S.Ct. 1912, 1916–17, 64 L.Ed.2d 559 (1980). A defendant's exercise of one of his rights does not disable the government from prosecuting the defendant for violating the law unless the purpose motivating the government's actions is a desire to punish the defendant for that exercise of his rights rather than for the crimes he has committed. Only where the purpose of the government's charging decision can be traced solely to the defendant's exercise of his rights as a punishment for that exercise does the Constitution forbid the government from taking that action.[28]

---

**27.** *Hardwick v. Doolittle*, 558 F.2d 292, 301 (5th Cir.), *on petition for rehearing and rehearing en banc*, 561 F.2d 630 (1977) (per curiam), *cert. denied*, 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978).

**28.** The analysis here is parallel to the analysis established for the inquiry under the Equal Protection or Due Process Clauses into whether a facially neutral statute harbors a discriminatory purpose. In such a case, the party challenging the statute must prove that "the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2285, 60 L.Ed.2d 870 (1979). Proof that the decisionmaker employed such a purpose then shifts the burden of proof to that party to establish "that the same decision would have resulted even had the impermissible purpose not been considered." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270 n.21, 97 S.Ct. 555, 566, 50 L.Ed.2d 450 (1977). Where the decisionmaker carries this burden successfully "the complaining party ... no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose" and "there would be no justification for judicial interference with the challenged decision." *Id.* The test set out in the above text merely collapses the two inquiries under *Pearce* into one formula. *See* Note, Discriminatory Purpose and Disproportionate Impact: An Assessment after Feeney, 79 Colum.L.Rev. 1376, 1397 (1979) ("the language [of *Feeney*], if read literally, seems to require a very particular kind of causation—a 'but for' relationship between the adoption of a policy and the adverse effects caused by it—and implies the need for a very particular kind of gender-based motivation—animus, or desire to harm.") (footnotes omitted). The method of proving "but for" causation in the *Pearce* context should follow the procedure the Fifth Circuit has already set out for resolving issues of this type, *see* notes *11-19* and accompanying text, *supra*, as modified by *Bordenkircher, see* pp. 316–322, *supra,* which is essentially identical to the procedure adopted in *Feeney* and *Arlington Heights.*

The Equal Protection analysis is an appropriate comparison to the *Pearce* analysis because both are designed to isolate and ban illegitimate purposes for the government's acts. The *Feeney-Arlington Heights* test is designed to identify discrimination banned by the Equal Protection and Due Process Clauses while the analysis set out here is designed to identify retaliation banned by the Due Process Clause

These last two principles can be discerned when *Pearce, Blackledge,* and *Bordenkircher* are compared. In *Pearce,* the defendant could not have received a more severe sentence had he not challenged his conviction because the Double Jeopardy Clause would have prohibited the trial judge from increasing the severity of an already imposed sentence absent the defendant's challenge to his conviction. *See Ex parte Lange,* 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1874). Similarly, the prosecution in *Blackledge* could not have reprosecuted Perry for the felony assault charge in the absence of Perry's exercise of his right to a trial *de novo* because the Double Jeopardy Clause would have barred such a reprosecution. *See Brown v. Ohio, supra,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187, unless the state was unable to proceed on the felony charge at the outset, *id.* at 169 n.7, 97 S.Ct. at 2227 n.7, in which case the *Blackledge* court would also have permitted the recharging. *Blackledge v. Perry, supra,* 417 U.S. at 29 n.7, 94 S.Ct. at 2103 n.7. Both the trial judge in *Pearce* and the prosecutor in *Blackledge* had already made their decisions regarding the punishment the defendant and his conduct merited and

only the defendant's own actions in challenging his conviction opened up the possibility that a more severe penalty could be imposed. Hence, both "but for" causation and a retaliatory purpose could easily be shown in these cases. In *Bordenkircher,* however, neither requirement could be easily demonstrated. The prosecution could have proceeded on the more serious charge at the outset and then refused to plea bargain at all. The Double Jeopardy Clause could not be used as a device for measuring "but for" causation because the trial had not yet begun and so the provisions of the Clause had not yet come into effect. *See Crist v. Bretz,* 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978) (jeopardy attaches in a jury trial when the jury is empaneled and sworn). Hence, because the decision regarding which charge to file first was arbitrary, there was no clear way to establish "but for" causation in the abstract in *Bordenkircher.* Even if "but for" causation could be demonstrated on the facts of the case in *Bordenkircher,* the state's purposes for charging Hayes as a recidivist were legitimate and different from a purpose to impose a punishment upon entirely lawful conduct.[29]

under *Pearce.* At the same time, both tests also recognize that the government does not necessarily operate on the basis of illegitimate motives simply because of its actions harm an individual in the same fashion and to the same degree as would occur had the government premised its behavior on such an illegitimate purpose. The necessary allocation of benefits and burdens which is at the heart of government will inevitably harm some individuals, even if only because they, unlike the rest, do not receive a benefit. However, "[t]he equal protection clause does not function with respect to legislatures the way tort law does with respect to individuals—to prevent them from inflicting 'harm'—but simply ensures that the considerations the legislature takes into account are legitimate ones." Note, *supra,* 79 Colum.L.Rev. at 1392–93. Similarly, "[b]y necessity the public prosecutor must take hard positions contrary to the liberty interests of the accused." *United States v. Andrews,* 633 F.2d 449, 459 (6th Cir. 1980) (Merritt, J., dissenting). *See Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), quoted at p. 311, *supra. Pearce* does not prohibit the government from taking the necessary and available steps to bring a defendant to justice

but only prohibits the government from exercising its authority in retaliation for a defendant's exercise of his rights in order to punish him for that action rather than for the crimes he allegedly committed or because of his nature as an offender.

In essence, then, the Due Process principle identified in *Pearce* is an attempt to eliminate such retaliation from the criminal process and the procedure set out in this case and the Fifth Circuit's cases is the manner in which such retaliatory purpose can be isolated and exorcised.

29. The use of the Double Jeopardy Clause as a surrogate for measuring "but for" causation in the above cases does not mean, however, that the Due Process principle identified in *Pearce* is violated only where the Double Jeopardy Clause would be violated absent some action by the defendant. If the defendant can prove that the government's act violate *Pearce* even though they would not violate the Double Jeopardy Clause, the defendant is still entitled to prevail on his claim. The Double Jeopardy Clause is just one device for measuring whether the "but for" causation exists, and other procedures, such as the procedure adopted by

▮ Fourth, and closely related to the last point, the presence of subjective, "vindictive" motivation, as that term would normally be understood, by the prosecutor is not dispositive or even necessarily relevant to the question of whether the prosecution has acted "vindictively" in the constitutional sense of that term. The prosecutor in *Bordenkircher* made it quite clear that he charged Hayes as a habitual criminal only because Hayes refused to plead guilty to a simple felony charge. *Bordenkircher v. Hayes, supra*, 434 U.S. at 358 & n.1, 98 S.Ct. at 665 & n.1. This motivation did not establish vindictiveness in the constitutional sense, however, because the Due Process Clause does not define "vindictiveness" in the same manner that the criminal law defines the *mens rea* necessary for a crime. The state's actions in *Bordenkircher* were harsh but not unconstitutional because the state was entitled to bring the recidivist count against Hayes either before or after any plea negotiations.

Finally, *Bordenkircher* also limits the expansion of *Pearce* and *Blackledge* by recognizing that the logic of the principle identified in those cases is not automatically transferrable to different contexts and that the policies promoted by those cases can be overcome by competing interests. While the rule of *Pearce* and *Blackledge*—that a defendant should not be punished because he has exercised his rights—was facially applicable to the situation in *Bordenkircher* and could have been expanded to cover that situation—where the defendant was prosecuted as a recidivist only because he refused to plead guilty and went to trial instead—carrying that rule over to the situation in *Bordenkircher* would have forced it beyond

"the limit of its logic," B. Cardozo, The Nature of the Judicial Process 51 (1921), by overlooking any competing interests and simply engaging in "the domino method of constitutional adjudication ... wherein every explanatory statement in a previous opinion is made the basis for extension to a wholly different situation." Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Calif.L.Rev. 929, 950 (1965). That competing interests may curtain the logical expansion of a constitutional principle is a well-established constitutional principle, however, as the court, through Mr. Justice Holmes, stated in *Hudson Water Co. v. McCarter*, 209 U.S. 349, 355, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908):

All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached .... The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side.

▮ Had the court come to a contrary result in *Bordenkircher*, the decision would have had several undesirable consequences. A contrary result would have either eliminated both a prosecutor's charging discretion in plea bargaining and the institution of plea bargaining itself or would have driven both practices underground.[30] Nei-

---

the Fifth Circuit, can also be employed to uncover a violation of *Pearce*.

**30.** A contrary decision in *Bordenkircher* would have impaired the flexibility of a prosecutor's charging discretion by freezing the charges against an accused to those charges instituted prior to any plea negotiations. This, in turn, would encourage prosecutors to charge the most serious offense(s) available against an accused as early as possible in order to maintain charging discretion in the only available direction—downward. This result would not be desirable for either the defendant or the

government. *See United States v. Lovasco*, 431 U.S. 783, 791–95 & nn. 11–15, 97 S.Ct. 2044, 2049–51, & nn. 11–15, 52 L.Ed.2d 752 (1977). In addition, because the order in which the prosecutor decides to file the charges is irrelevant to the question of vindictiveness, *see Bordenkircher v. Hayes*, 434 U.S. 357, 360–61, 98 S.Ct. at 666 (1978), the prosecutor's refusal to lower a charge in return for the defendant's offer of a plea of guilty to a lesser offense would have to be treated the same as the prosecutor's addition of a charge in response to a defendant's refusal to accept a plea to a lesser

ther consequence would have been desirable for either the government or the defendant.[31] The *Bordenkircher* court's recognition of the undesirable consequences of the rule proposed by the defendant there was an important factor in the court's refusal to extend *Pearce* and *Blackledge* to their logical end.

### 4. Application of *Bordenkircher* to this case.

The analysis followed by the *Bordenkircher* court is applicable here. First, assuming that the vindictiveness doctrine is at all applicable where the government's second prosecution carries a less severe penalty than the first charge,[32] there was no retaliation here in the literal or the constitutional sense because the defendant did not exercise any right prior to the filing of the outstanding bill of information by the government. In *Pearce* and the line of cases following it, the defendant had exercised some right which triggered the vindictiveness analysis of the government's subsequent action. Here, the first right the defendant could be said to have exercised—his right to challenge the government's refusal to permit the grand jury to vote whether to return an indictment—occurred on December 4, 1980, over one week after the government filed its bill of information on November 26, 1980. Hence, there is nothing in this case to trigger the vindictiveness analysis set out above.

In addition, even if the defendant's decision to testify before the grand jury brings this case within the *Pearce* analysis, it cannot be said in this case that the government would not have exercised its charging discretion to file this misdemeanor charge "but for" the defendant's decision to testify before the grand jury. The government's decision to bring this prosecution also cannot be traced to any purpose to punish the defendant because he decided to attempt to dissuade the grand jury from returning an indictment against him, or, for that matter, because he attempted to force the government to put the matter before the grand jury to a vote. The institution of this misdemeanor prosecution can be traced to the government's failure to obtain a felony indictment against the defendant, even though that failure was brought about, at least in part, by the government's own actions. Had the grand jury in this case voted not to return an indictment against the defendant, the government's decision to

offense because the "penalty" upon a defendant's exercise of his right to a trial would be the same. To avoid this result, a prosecutor would have to wait until the completion of any plea negotiations before filing any charges. This procedure, however, would not only put the prosecution in danger of violating the first consequence noted above but also would either transfer the charging decision to the defendant by letting his willingness to negotiate dictate what offenses the prosecution could charge or would eliminate the plea bargaining process entirely for the same reason the prosecutor's charging authority would be eliminated. These consequences would also be undesirable. *See United States v. Lovasco, supra,* 431 U.S. at 791–95 & nn. 11–15, 97 S.Ct. at 2049–51 & nn. 11–15 (recognizing desirability of prosecutorial charging discretion); *Blackledge v. Allison,* 431 U.S. 63, 71, 97 S.Ct. 1621, 1627, 52 L.Ed.2d 136 (1977) (recognizing desirability of plea bargaining). Finally, because plea bargaining can be valuable to all parties concerned it would inevitably occur but would be driven from public scrutiny in order to preserve the appearances necessary for the entry of guilty pleas to less than the maximum charge possible to be con-

stitutionally permissible. This *sub rosa* process, however, would hinder the proper administration of plea bargaining thought necessary to ensure that the interests of all the parties are safeguarded. *See Santobello v. New York,* 404 U.S. 257, 261–62, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971).

**31.** *See* note 30, *supra.*

**32.** The Fifth Circuit held in *Jackson v. Walker,* 585 F.2d 139 (1978) that a defendant could establish prosecutorial vindictiveness even though the second prosecution carried a less severe penalty than the first because "vindictiveness is an improper factor in the prosecutorial process." *Id.* at 146 n.12. Although other parts of the *Jackson* decision have not survived *Bordenkircher, see* p. 315, *supra,* this one has. Bearing in mind that the "vindictiveness" spoken of here refers to vindictiveness in the constitutional and not the literal sense, *see* p. 322, *supra,* the Due Process Clause prohibits the government from punishing a defendant for his lawful exercise of his rights regardless of how small the punishment may be.

prosecute this charge by bill of information would properly be characterized as a response to the action of the grand jury rather than the defendant. This action would be entirely permissible. The government's decision to institute a second attempt at prosecution when motivated by its desire to overcome its failure to convince the first grand jury to accuse a person of crime and to bring a defendant to account for crimes he allegedly committed is not barred by the vindictiveness doctrine. The only difference between that situation and this one is that here the government declined to permit the grand jury to vote on an indictment. This distinction does not make a difference on this issue, however, because the government's actions here cannot be traced to any retaliatory purpose any more than the government's actions in the former case can be traced to any retaliatory purpose. Because there is no difference of constitutional magnitude between the two situations, the government's actions cannot be classified as an unconstitutional, retaliatory response to the defendant's acts.

 Finally, there are strong reasons for not applying the *Pearce* rule in this context. Applying *Pearce* to the situation in which the prosecution initiates a second attempt at prosecution for the same conduct and on the same charges the government initially attempted, but failed, to obtain would radically transform the nature of the pretrial process. At present, the grand jury and the preliminary hearing both operate as initial stages in the criminal process which culminates in a trial on the merits of the charges brought against a defendant. Unlike the petit jury, or trial judge in a bench trial, the grand jury or the judicial officer presiding at a preliminary hearing do not have the authority to issue a final judgment on a defendant's guilt or innocence but have only the authority to decide whether probable cause exists to accuse a person of an offense. *See ante* at 310. The decision of the grand jury or magistrate not to charge a person with an offense also does not permit that person to assert a *res judicata* defense to a subsequent prosecution. *See ante* at 310–

311. Adopting the defendant's argument, however, would transform the grand jury's deliberations or the preliminary hearing from merely a pretrial proceeding designed to determine whether probable cause to charge a person with crime existed into a full-scale trial of the merits of the government's case at absolutely no cost to the defendant. The grand jury or the magistrate would be invested with the authority to issue a final judgment on the question of the defendant's guilt or innocence that was binding on the government but not the defendant and that would have to be accorded the same finality as the decision of the petit jury or judge at trial, barring any future prosecution for those offenses. This result is simply unacceptable for several reasons. First, this result would invest the grand jury and the magistrate with authority not contemplated by the common law, the Federal Rules of Criminal Procedure, or the Constitution, and which Congress and the courts have consistently denied to either body. *See ante* at 310–311. Second, the defendant's argument would, in effect, create a second "trial" for every defendant despite the Sixth Amendment limitation of the criminal process to one trial. U.S. Const. Amend. VI ("*a speedy and public trial*") (emphasis added). Third, the defendant's argument would equate the grand jury provision of the Fifth Amendment with the trial provision of the Sixth Amendment despite the obvious intent of the Framers to create two entirely separate institutions. Nothing in *Pearce* or any of the cases following in its wake even remotely suggests that the Constitution requires an overhauling of the entire pretrial process to avoid the prohibited retaliation against a defendant.

 These concerns are even stronger in this case because the misdemeanor bill of information alleges a different offense than the felony that was before the grand jury. Section 111 of Title 18 and § 7212(a) of Title 26 each require "proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182,

76 L.Ed. 306 (1932).[33] Because of this difference between the statutory elements of proof for violations of these two statutes, the government could prosecute the defendant for both offenses in the same proceeding, *see Albernaz v. United States, supra*, —— U.S. at —— – ——, 101 S.Ct. at 1144–45, or in successive proceedings. *See Illinois v. Vitale*, 447 U.S. 410, 416, 100 S.Ct. 2260, 2265, 65 L.Ed.2d 228 (1980); *Brown v. Ohio, supra*, 432 U.S. at 166, 97 S.Ct. at 2225. Accepting the defendant's argument, then, would have the anamolous effect of freeing a defendant from any criminal charges arising out of the same transaction which formed the basis for a charge that the government was unable to obtain from the grand jury or the magistrate. The Supreme Court has consistently refused to apply this rule to the decision of the petit jury or judge at trial, *compare, e. g., Ashe v. Swenson*, 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970) *and id.* at 448, 90 S.Ct. at 1196 (Harlan, J., concurring), *with id.* at 453–54, 90 S.Ct. at 1199 (Brennan, J., concurring), *and Harris v. Oklahoma*, 433 U.S. 682, 683, 97 S.Ct. 2912, 2913, 53 L.Ed.2d 1054 (1977) (Brennan, J., concurring), and, therefore, it would be irrational to apply this rule to the decision of the grand jury or magistrate.

In conclusion, there has been no unconstitutional vindictiveness in this prosecution and the defendant's argument must be rejected.

### C

The defendant's final argument is that the government's actions in this case constitute misconduct that warrants a dismissal of this information because the government's actions are an attempt to subvert the operation of the grand jury. This Court need not dwell on this argument. From the above discussion, it should be clear that the government is entitled to bring this misdemeanor prosecution by a bill of information and would be entitled to do so had the grand jury voted not to return an indictment against the defendant. Therefore, if the government could have brought this prosecution after receiving an adverse decision from the grand jury, the government is equally entitled to bring this prosecution after receiving no decision from the grand jury. The government's actions in declining to submit the evidence before the grand jury to a vote is irrelevant in this regard. These actions are relevant to the matter currently on appeal to the Fifth Circuit regarding the manner in which the government handled the grand jury investigation of this case but they are not relevant to the government's authority to bring this charge against the defendant.

The above discussion also disposes of the argument that public policy is violated by permitting this prosecution. What the Fifth Circuit said in *United States v. Mann, supra*, 517 F.2d 259, in a similar context is applicable here:

> It is not for the courts to decide whether a criminal prosecution contravenes some vaguely defined "public policy." Indeed, it has been stated that "public policy favors the unencumbered enforcement of criminal laws . . . ." . . . If an indictment sufficiently alleges a violation of the laws of the United States, and the prosecution of that indictment is not precluded on constitutional grounds . . . the courts may not dismiss an indictment on the grounds of public policy.

*Id.* at 271 (citations omitted).

### IV

■ Percolating throughout the defendant's memorandum and argument before this Court is, basically, one recurrent theme: that the government is attempting to persecute him even though he did nothing wrong. This Court is not unsympathetic to the defendant's complaint. On its face, this is a rather unusual case for a federal prosecution, and this Court would have serious doubts about the wisdom of the government's course of action were it entitled to make such a judgment. But this Court is not privy to the government's de-

---

**33.** *See* notes 4 & 10, *supra* and accompanying text.

liberations, and the virtue in this exercise of the government's authority may yet appear. In any event, this Court cannot rely on its own sympathies as the basis for a judicial decision. "The temptation to exceed our limited judicial role and do what we regard as the more sensible thing is great, but it takes us on a slippery slope. Our duty, to paraphrase Mr. Justice Holmes in a conversation with Judge Learned Hand, is not to do justice but to apply the law and hope that justice is done." *Bifulco v. United States, supra,* 447 U.S. at 401–02, 100 S.Ct. at 2259–2260 (Burger, C. J., concurring).